No. 78,370

STATE OF KANSAS, *Appellee,* v. MICHAEL DEAN WILKINS, *Appellant.*
(985 P.2d 690)

Opinion filed May 28, 1999.

*Carl A. Fleming*, of Fleming & Fleming, of Eudora, was on the brief for appellant.

*Michael Dean Wilkins*, appellant, was on a separate brief pro se.

*Jim A. Vanderbilt*, county attorney, and *Carla J. Stovall*, attorney general, were on the briefs for appellee.

The opinion of the court was delivered by

DAVIS, J.: Michael Dean Wilkins was convicted of first-degree premeditated murder, conspiracy to commit murder, aggravated robbery, and conspiracy to commit aggravated robbery. He claims that his convictions for conspiracy to commit murder, aggravated robbery, and conspiracy to commit aggravated robbery must be reversed on the basis of a 2-year statute of limitations. He also claims he was entitled to a directed verdict and that certain testimony against him was erroneously admitted.

The remains of David Shipley were found in and around a farm pond on land near the residence of Glenda and Howard Wilkins, the defendant's parents, in rural Jefferson County. Dental records established that the remains were those of Shipley. The defendant and Mike Bittle were charged in connection with Shipley's murder. Their cases were severed for trial.

At the defendant's trial, Bittle was called as a witness for the State. He testified he met the defendant when he was recruiting for a Ku Klux Klan group in Lawrence. Bittle formed his own Klan group, recruited the defendant, and installed the defendant as his enforcer. Bittle testified that he used the defendant to intimidate others.

In 1991 or 1992, Bittle moved to Davenport, Iowa, so that his wife, Stephanie Brooks, could attend chiropractic school. He turned the leadership of his Klan group over to a friend in Independence, Missouri, and embarked upon a new career growing

marijuana in the basement of his duplex in Iowa. The defendant visited Bittle in Iowa on numerous occasions to help Bittle set up his hydroponic marijuana growing operation.

In 1993, S.M., a 17-year-old, moved in with Bittle and his wife. S.M. was dating Bittle at the time with the full knowledge of Bittle's wife whom Bittle said did not mind if he dated other women. Around the same time, Bittle met the victim, David Shipley, and he also moved in with Bittle.

According to Bittle, Shipley suggested that Bittle start up Klan activities again because it would be a good way to "pick up girls" because the girls would think it was "cool." In June 1993, M.R., a 16-year-old runaway, joined the Klan and moved into the duplex. At first she dated Shipley but then began dating Bittle. Bittle stated that as an initiation rite, new female members would have to sleep with three male Klan members.

Bittle testified that the female members would shoplift to support the Klan and sometimes engage in prostitution at his orders. During this time, Shipley was working as a male stripper and his job for the Klan was to recruit new female members. The defendant and a friend from Lawrence, Doug Gray, would often visit Bittle in Iowa and participate in activities such as making pornographic movies and having sex with female Klan initiates, S.M. and M.R. At one point, Gray went with S.M. to steal money from a bar owned by her mother.

According to Bittle, problems surfaced in the Klan group when L.D., a 16-year-old friend of S.M., became involved with the group. Shipley told Bittle he wanted to have a relationship with L.D. Bittle stated that he was in charge of controlling the relationships of the female members. Bittle then heard from S.M. that Shipley had raped L.D. Later, however, he testified that he learned that L.D. had only claimed to be raped by Shipley because she had sex with Shipley and was afraid Bittle would be angry with her if he found out that she had done so without his permission.

Bittle testified that he was angry with Shipley over the incident with L.D. and also because Shipley was constantly fighting with S.M. He was also concerned because Shipley was trying to displace the defendant as Bittle's "right hand" person. The defendant told

him that Shipley was threatening to leave the Klan and tell police about the marijuana growing operation. The defendant also told Bittle that Shipley was "getting out of hand" and that something needed to be done, a statement with which Bittle agreed. Bittle testified that the defendant was also mad because the defendant wanted to have sex with L.D. but she turned him down for Shipley.

During June or July of 1991, Shipley moved to Lawrence in order to work with the defendant in construction. Trouble came to a head when Bittle, M.R., S.M., and Stephanie Brooks traveled to Independence, Missouri, in late July. They were joined at a motel in Independence by the defendant, Shipley, and Gray. During the course of the evening, Shipley and S.M. began fighting again and the defendant told Bittle that Shipley was "out of control" and something needed to be done.

Later, in the motel bathroom, Bittle told the defendant that he was tired of Shipley causing friction and that he did not want to see Shipley anymore. According to Bittle, the defendant asked, "What do you mean, kill him?" to which Bittle replied, "Do what you have to do, I just don't want to see him anymore." He also told the defendant to bring back the necklace Shipley wore as proof that the defendant had taken care of Shipley. After the defendant, Shipley, and Gray left the motel, Bittle began having second thoughts and spent a sleepless night because he knew what he had done was wrong. The next morning, he went to the defendant's trailer to try to stop the killing but the defendant was not there.

The defendant returned later that morning and told Bittle that Shipley was not going to be a problem anymore and handed Shipley's necklace to Bittle. The defendant said that he had shot Shipley in the face. The defendant and Gray passed out Shipley's possessions to members of the group. According to Bittle, the defendant burned other possessions of Shipley and told him that there was "no trace" of Shipley left.

When questioned regarding the exact date of the murder, Bittle was unable to pin it down exactly. He stated that he and the others left Davenport for Independence on a Friday night, arriving in the early morning hours on Saturday. They later picked up the defendant from work on Saturday afternoon and had the discussion

which led to the killing, which Bittle thought occurred on Sunday, August 1, 1993.

After the killing, Bittle testified that he allowed Shipley's car, which was parked in front of the duplex in Iowa, to be towed by police. Whenever the defendant talked about Shipley, according to Bittle, the defendant would refer to Shipley as "turtle bait."

In the months following Shipley's killing, the Klan group split up. L.D.'s father got angry with Bittle and called the police to raid Bittle's house. Although Bittle was not arrested, he felt that the time had come to move on and he, Brooks, and M.R. moved to Kansas City. Bittle and Brooks separated and Bittle and M.R. moved to Springfield, Missouri. Bittle and M.R. then got into a disagreement causing Bittle to move to Texas where he was finally arrested in connection with Shipley's death.

Bittle testified that when he was first brought into the Jefferson County jail, the defendant, who was also in the jail, told him that they needed to implicate Gray in the murder and cast all blame on him. Bittle sent a note back to the defendant agreeing to say that Gray committed the crime, which note was introduced into evidence. However, on the advice of his new counsel, Bittle decided to accept a plea bargain wherein he pled guilty to conspiracy to commit murder and conspiracy to commit aggravated robbery in exchange for his testimony.

Gray also testified regarding the actual killing of Shipley. Gray stated that he was introduced to Shipley by the defendant and went with the defendant to Iowa to help the group cultivate marijuana. Gray testified that he was a member of the Klan although he joined mainly so that he could smoke marijuana and have sex with Brooks and S.M. He stated that Bittle controlled the group.

According to Gray, tension between Shipley and Bittle intensified when Shipley sold a motorcycle and gave the money to Bittle, and Bittle was slow in repaying Shipley. Bittle told Gray that Shipley had threatened to tell police about the marijuana growing operation.

Gray testified that on the day of the shooting, the defendant told him that he, the defendant, and Shipley were going out to the defendant's parents' property to check on marijuana plants that the

defendant's younger brother was growing. The defendant was armed with a .22 caliber long rifle. Gray testified that upon arriving at the property, they walked to a nearby pond. The defendant suddenly kicked Shipley, saying, "That's from Bittle." The defendant then pointed the gun at Shipley and stated, "This is for fuckin' the Klan," and shot Shipley through the eye. The defendant took Shipley's necklace saying that Bittle wanted it.

Gray and the defendant then sunk Shipley's body in the pond. They then returned to the defendant's trailer where the defendant told Bittle about the murder and gave Bittle the necklace. Some months later, the defendant told Gray that Shipley's body had surfaced in the pond, so the defendant had scattered the bones.

After police arrested Gray, he agreed to wear a hidden tape recorder to attempt to gain information from the defendant. However, both times he attempted to talk to the defendant, the defendant whispered to him and the tape could not pick up the defendant's words. Gray reported that when he told the defendant he was scared of getting caught, the defendant told him to stay calm and tell the police that Shipley had gone to live with an uncle in Florida. Gray later led the officers to the pond where Shipley's remains were recovered.

M.R. testified that when the group went to the defendant's trailer in Lawrence on the day of the murder, she asked Bittle where Shipley was as she knew that Shipley had been staying with the defendant. Bittle told her that he had ordered the defendant to kill Shipley and the defendant had taken Shipley hunting on the defendant's parents' property and shot him, sinking the body in the pond afterwards. M.R. testified that she saw Bittle with Shipley's necklace. M.R. also testified that she was later going through the Klan files when she came across Shipley's file. Bittle told her to put it in the "traitor" file and referred to Shipley as "turtle bait."

M.R. testified that during the breakup of the Klan group, she and Bittle got into a fight and she moved out. She then called the police and reported Shipley's murder. M.R. was unsure of when the murder actually occurred, although it was in June or July of 1993. She thought the group left Davenport for Independence on a Friday night, arrived Saturday morning, and then went to

Lawrence that same morning. However, she admitted that she did not know if they went to Lawrence on Saturday or Sunday. She thought that they returned to Iowa the same day she found out Shipley had been killed.

S.M. testified that there was tension in the group because L.D. wanted to date Shipley but Bittle did not want her to do so without joining the Klan group first. S.M. stated that L.D. slept with Shipley but was afraid Bittle would be angry, and told Bittle that Shipley raped her. S.M. described the defendant as being Bittle's "enforcer." She testified that Bittle told her the defendant was "there to take care of his dirty work."

S.M. stated that when the group returned to Iowa, she did not know Shipley was dead. Instead, she thought he was simply in Lawrence and being kept away from L.D. In order to get L.D. to join the Klan group, Bittle ordered S.M. to move Shipley's suitcases around in the duplex and spray shaving cream in the sink to make it appear as though Shipley was still living in the Iowa duplex. However, Bittle later told S.M. that the defendant was already dead at the time she was performing these activities. S.M. was also unsure of the time the events occurred, although she stated it could have been July or August 1993.

L.D. also testified on behalf of the State. She stated that she had been introduced to the Klan group by S.M. and that she frequented Bittle's duplex. She became close to Shipley although she denied any sexual relationship. L.D. testified that the defendant showed some interest in her and Shipley warned her to stay away from the defendant. Shipley told her that he was leaving Davenport and the Klan. L.D. testified that many times Bittle and the defendant would threaten Shipley.

Detective Randy Carreno testified concerning evidence collected in the case and the arrest of the defendant. He stated that a .22 caliber long rifle was recovered from the defendant's parents' house. The rifle had a broken stock and had been described by Gray as the rifle used in the murder. Records from the motel in Independence showed that the group had checked in during the early morning hours of Saturday, July 31, and checked out on Sunday, August 1, 1993.

Carreno testified that when the defendant was arrested and questioned about Shipley's disappearance, the defendant stated that Shipley went to Texas from Lawrence. Later, the defendant told Carreno that he had driven Shipley to the bus station in Lawrence and that Shipley had been heading to Florida. The defendant characterized Bittle as a liar and stated that Bittle "would probably know about" Shipley's disappearance.

When Carreno informed the defendant they had found the pond where the body was hidden, the defendant stated, "Out by my Mom's." Carreno had not informed the defendant that the pond was by his parent's house. Carreno further told the defendant the murder weapon had been recovered, to which the defendant replied he already knew that as his mother had called and told him. Carreno had not informed the defendant that the weapon was recovered from his parents' house. When Carreno asked the defendant if he would like to see the murder weapon, the defendant stated that he already knew what the rifle looked like.

The State also called Shipley's father. He testified that Shipley did not have an uncle in Florida or any contacts in Texas and that he had not heard from Shipley since Father's Day in 1993.

Mike Crumet, the defendant's employer, also testified. Crumet stated that according to his records, the defendant worked from 7 a.m. to 3:30 p.m. on Saturday, July 31, 1993.

At the close of the State's case, the defendant moved to dismiss the two conspiracy charges and the aggravated robbery charges as being outside the statute of limitations. The trial court denied the motion on the grounds the crimes had been concealed. The defendant also moved for a directed verdict which was denied. The defendant was found guilty on all counts. He received a sentence of life in prison with parole eligibility in 15 years on the murder charge and a controlling sentence of 172 months on the other convictions to run consecutively. His motion for new trial was denied.

1. Statute of Limitations

The defendant's contention that the trial court erred in failing to dismiss the two conspiracy charges, as well as the aggravated robbery charge, as outside the statute of limitations, is without

merit. The trial court based its denial on the fact that the crimes were concealed.

Under K.S.A. 21-3106(5), a prosecution for the crimes of conspiracy to commit murder, conspiracy to commit aggravated robbery, and aggravated robbery must be commenced within 2 years after their commission. In this case, although the crime occurred around August 1, 1993, prosecution was not commenced until May 21, 1996, clearly outside the time prescribed by the statute. However, K.S.A. 21-3106(6)(c) provides that the running of the statute will be tolled for any period in which the fact of the crimes is concealed.

In order to constitute concealment of the fact of a crime, there must be a positive act done by the accused calculated to prevent the discovery that the offense has been committed. Mere silence, inaction, or nondisclosure does not constitute concealment. *State v. Mills*, 238 Kan. 189, 190-91, 707 P.2d 1079 (1985). Further, simple disposal of the stolen property is not sufficient to constitute concealment. *State v. Palmer*, 248 Kan. 681, 686, 810 P.2d 734 (1991).

The defendant first argues that he did not conceal the crime of aggravated robbery because he gave the alleged stolen property, the necklace, and other property taken to Bittle and other members of the Klan. However, this argument overlooks the fact that although the property was distributed to other persons, each of those persons were Klan members who were under the command of Bittle, the very person who ordered Shipley's murder and the taking of the property. Moreover, property not distributed was burned.

Concealment occurs where the defendant attempts to conceal the fact that the crime has been committed from either the owner of the property or others who would be expected to notify authorities regarding the crime. See *State v. Gainer*, 227 Kan. 670, 674-75, 608 P.2d 968 (1980) (noting that in a theft case concealment is action which is calculated to prevent discovery of the theft by those owning or having possession of the property prior to the theft); *State v. Turner*, 91 Ohio App. 3d 153, 155-56, 631 N.E.2d 1117 (1993) (concealment of the fact of the crime ends when any

competent person other than the wrongdoer or someone equally at fault with him or her has knowledge of both the act and its criminal nature).

In *Turner*, the court held that a theft was concealed even though the brother-in-law of the perpetrator had knowledge of the crime and where the perpetrator managed to conceal the fact of the crime from the victim. 91 Ohio App. 3d at 156. The court held that even though the brother-in-law discovered the crime, a family member should be excepted as a discoverer because such a relative is unlikely to fulfill the public duty to report the commission of a crime by another family member. 91 Ohio App. 3d at 156.

The defendant sunk the victim's body in a pond, thus attempting to conceal both the fact that the victim had been murdered and that Shipley's possessions had been taken. Further, there is evidence the defendant returned to the pond and scattered Shipley's remains after the body came to the surface. Although the defendant reported the murder to Bittle and distributed some of Shipley's possessions to other members of the Klan, these members were unlikely, because of their involvement with Klan activities, to report the robbery to authorities.

Concealment of aggravated robbery occurred in this case because there was a positive act done by the defendant calculated to prevent the discovery of the aggravated robbery, either by the owner or by any other competent person likely to fulfill the public duty to report the offense to authorities. See *State v. Mills*, 238 Kan. at 190-91; *Turner*, 91 Ohio App. 3d at 155-56. We conclude that the trial court properly determined the crime of aggravated robbery was concealed so as to toll the running of the statute of limitations.

Regarding the crimes of conspiracy to commit murder and conspiracy to commit aggravated robbery, the defendant argues that the alleged sinking of Shipley's body cannot constitute an act to conceal the crime of conspiracy because the actual murder or robbery of Shipley is not an element of the crimes of conspiracy to commit murder and conspiracy to commit aggravated robbery.

Conspiracy requires proof that the defendant entered into an agreement with another person to commit or assist in the com-

mission of a crime and that the defendant committed an overt act in furtherance of the conspiracy. See K.S.A. 21-3302. The overt act necessary to support a conspiracy need not be criminal in itself or the crime that is the object of the conspiracy. See *State v. Hill*, 252 Kan. 637, 642, 847 P.2d 1267 (1993). However, in this case, the overt act alleged for the crime of the conspiracy to commit murder was the murder itself, and the overt act alleged for the commission of aggravated robbery was the aggravated robbery itself. Therefore, in hiding the body in the pond, the defendant was effectively seeking to conceal not only the fact of the murder and robbery but also the fact of the overt act committed in furtherance of the conspiracy to commit murder and aggravated robbery. Where the overt act in furtherance of the conspiracy to commit the crime is the crime itself, concealment of the crime also necessarily conceals the conspiracy to commit that crime. The trial court properly determined that the defendant had concealed the crimes of conspiracy to commit murder and conspiracy to commit aggravated robbery so as to toll the running of the statute of limitations.

## 2. Directed Verdict

The defendant contends the trial court erred in not sustaining his motion for directed verdict. He argues that assuming all of the State's witnesses were telling the truth, the evidence was conflicting as to the time Shipley was murdered and, therefore, not sufficient to convict the defendant. There is no merit in this argument.

A motion for directed verdict at the close of the State's case is essentially a motion for judgment of acquittal and is judged by the standards of sufficiency of the evidence. *State v. Dubish*, 234 Kan. 708, 716, 675 P.2d 877 (1984). When the sufficiency of the evidence is challenged in a criminal case, the standard is whether, after a review of all the evidence, viewed in a light most favorable to the prosecution, the court is convinced that a rational factfinder could have found the defendant guilty beyond a reasonable doubt. See *State v. Claiborne*, 262 Kan. 416, Syl. ¶ 5, 940 P.2d 27 (1997). Under this standard, overwhelming evidence of guilt existed at the close of the State's case.

### 3. Admission of Testimony from Bittle and Gray

The defendant contends that the trial court's admission of testimony from Bittle and Gray violated his rights and was contrary to 18 U.S.C. § 201(c)(2) (1994). He bases this argument on *United States v. Singleton*, 144 F.3d 1343 (10th Cir. 1998), *overruled upon rehearing en banc* 165 F.3d 1297 (10th Cir. 1999). In *Singleton*, a panel of the Tenth Circuit Court of Appeals found that 18 U.S.C. § 201(c)(2), prohibits giving, offering, or promising anything of value to a witness for or because of his or her testimony and that this section applies to prosecuting attorneys. As a result, the court suppressed the testimony of a government witness to whom prosecutors had promised leniency in exchange for testimony.

We addressed this exact issue in the recent case of *State v. Barksdale*, 266 Kan. 498, 973 P.2d 165 (1999). In that case, we noted that *Singleton* had been overruled upon rehearing by the Tenth Circuit Court of Appeals. 266 Kan. at 515. See *United States v. Singleton*, 165 F.3d 1297 (10th Cir. 1999). We also noted that the rationale in *Singleton* was not applicable to cases in state courts. In *Singleton*, the court clearly stated: "We emphasize that the rule we apply today rests in no way on the Constitution; it is a creature solely of statute." 144 F.3d at 1361. We stated in *Barksdale*:

"Kansas has no statute comparable to 18 U.S.C. § 201(c)(2) (1994). While the defendant is free to argue that such a statute should be adopted, there is no constitutional prohibition against the testimony of a witness who receives benefits in exchange for testimony." 266 Kan. at 515.

The defendant in this case had ample opportunity to cross-examine both Bittle and Gray regarding any benefits they received from giving their testimony. The jury was, therefore, aware of the benefits and could take such benefits into account in assessing the credibility of both witnesses. The trial court did not err in allowing the testimony of either Bittle or Gray.

The defendant also alleges in his pro se brief that discounting the testimony of Bittle and Gray, there was insufficient evidence to convict him. Because the admission of the testimony of Bittle and Gray was proper, this argument is without merit.

## 4. Multiplicitous Charges

We raise the issue of whether the conspiracy charges against the defendant were multiplicitous. This issue was not raised by either of the parties. Although ordinarily an appellate court will not consider an issue which has not been raised in the trial court or which has not been raised by the parties on appeal, the court does have the power to do so in exceptional circumstances, where consideration of the new issue is necessary to serve the ends of justice or to prevent a denial of fundamental rights. *State v. Bell,* 258 Kan. 123, 126, 899 P.2d 1000 (1995). We believe this is such a case.

Recently, this court addressed the question of whether convictions for conspiracy to commit first-degree murder and conspiracy to commit aggravated robbery were multiplicitous. *State v. Mincey,* 265 Kan. 257, 963 P.2d 403 (1998). In *Mincey,* we determined:

"A single continuing conspiracy, however diverse its objects, cannot be broken down into component sub-agreements for the purpose of multiple punishments or multiple prosecutions. When separate conspiracies are alleged and both are founded on a general conspiracy statute, the relevant inquiry is whether there existed more than one agreement to perform an illegal act or acts." 265 Kan. at 268.

We found in *Mincey,* where the agreement between the coconspirators involved robbing a person and killing that person if necessary, the accused could only be convicted of one count of conspiracy. Accordingly, we reversed Mincey's conviction of conspiracy to commit aggravated robbery. 265 Kan. at 268.

In this case, there was one agreement between the defendant and Bittle to kill the victim and take his necklace as proof of the killing. The killing of the victim formed the basis for the first-degree murder charge and the taking of the necklace was the basis for the aggravated robbery charge. The defendant was convicted on two counts of conspiracy: conspiracy to commit murder and conspiracy to commit aggravated robbery. The single continuing conspiracy in this case cannot be broken down into component sub-agreements for the purpose of multiple prosecutions or punishments. 265 Kan. at 268. Accordingly, we reverse the defendant's conviction for conspiracy to commit aggravated robbery.

The defendant's convictions and sentences for first-degree premeditated murder, conspiracy to commit murder, and aggravated robbery are affirmed. His conviction for conspiracy to commit aggravated robbery is reversed, and his sentence for that crime is vacated.

Affirmed in part and reversed in part.