No. 95,023

MICHAEL D. WILKINS, *Appellant*, v. STATE OF KANSAS, *Appellee*.

(190 P.3d 957)

Opinion

filed August 22, 2008.

*Ronald Schneider*, of Lawrence, argued the cause and was on the briefs for appellant.

*Michael C. Hayes*, county attorney, argued the cause, and *Phill Kline*, attorney general, was with him on the brief for appellee.

The opinion of the court was delivered by

BEIER, J.: This K.S.A. 60-1507 appeal involves movant Michael D. Wilkins' 1996 convictions arising out of the 1993 murder of David Shipley. The district judge denied Wilkins collateral relief after an evidentiary hearing on his ineffective assistance of counsel

and *Brady v. Maryland*, 373 U.S. 83, 10 L. Ed. 2d 215, 83 S. Ct. 1194 (1963), claims. A panel of our Court of Appeals reversed and remanded for new trial in *Wilkins v. State*, No. 95,023, unpublished opinion filed November 22, 2006. We granted the State's petition for review.

We address the merits of each of the issues raised by Wilkins' motion in turn.

### Factual and Procedural History

In brief, Wilkins' 1996 convictions involved murder, sex, drugs, and the Ku Klux Klan. He had been recruited to be an enforcer and assistant to Klan group leader Mike Bittle. Bittle later turned his Klan position over to a friend, moved to Iowa, and began a new career growing marijuana; but he and Wilkins remained in touch. See *State v. Wilkins*, 267 Kan. 355, 356-57, 985 P.2d 690 (1999).

The man who would later become the murder victim, Shipley, persuaded Bittle to set up Klan activities in Iowa "because it would be a good way to 'pick up girls' because the girls would think it was 'cool.' " 267 Kan. at 357. Shipley moved in with Bittle; started sleeping with Bittle's girlfriends; raped a Klan initiate with whom Bittle wanted to have sex; and generally attempted to replace Wilkins as Bittle's assistant. None of these behaviors sat well with Bittle or Wilkins. In addition, because Bittle had been slow to repay a loan from Shipley, Shipley threatened to report Bittle's marijuana growing operation to law enforcement.

In the summer of 1993, Bittle, his wife and girlfriends, Wilkins, Shipley, and another man named Charles "Doug" Gray met at a Missouri motel. Bittle told Wilkins and Gray that he was tired of Shipley causing friction and that he did not want to see Shipley anymore. According to Bittle, Wilkins then asked, " 'What do you mean, kill him?' " Bittle then replied, " 'Do what you have to do, I just don't want to see him anymore.' " 267 Kan. at 358. Bittle also told Wilkins to bring him a necklace Shipley wore as proof that the Wilkins had taken care of the Shipley problem. Wilkins, Gray, and Shipley then left the motel.

Wilkins returned later, told Bittle that Shipley was not going to be a problem anymore, and handed Shipley's necklace to Bittle.

The group distributed some of Shipley's possessions and burned or otherwise disposed of the rest.

One of Bittle's girlfriends contacted police in late 1994 and reported what she knew about Shipley's evident murder. The resulting investigation languished until Gray, through an attorney, contacted authorities in early 1996 and demanded immunity in exchange for his cooperation. Gray agreed to wear a wire to gather information from Wilkins, but his two attempts to do so resulted in garbled recordings.

Gray took two polygraph tests for the Kansas Bureau of Investigation, and neither polygraph report was given to Wilkins or his counsel before trial. Each report contained the examiner's conclusion that Gray was being deceptive. Each report also mentioned that Gray had said in interviews that Shipley may not have been dead when Gray placed Shipley in a pond after Wilkins shot him. Gray ultimately received a promise of immunity in exchange for truthful testimony against Wilkins.

After Wilkins and Bittle were arrested in 1996, Wilkins suggested to Bittle that they cast all blame on Gray. In a note to Wilkins, which was intercepted and admitted at trial, Bittle agreed to implicate Gray. Bittle evidently reconsidered this choice, and he accepted a plea agreement in exchange for his testimony against Wilkins.

According to Gray, Wilkins had shot Shipley in the eye or head with Wilkins' .22 caliber long rifle. Gray and Wilkins then sank the body in a pond on Wilkins' mother's property in Jefferson County. Gray was the one who walked out in the pond and placed a rock in Shipley's shorts to weight them. Several months later, Wilkins told Gray that the body had surfaced and that Wilkins had scattered the bones; but Gray was able to lead officers to the pond, where remains were discovered.

Michael Finnegan, a forensic anthropologist, concluded that the remains were that of a young white male, ranging in height from 5'8" to 5'11". Dr. Daniel Winter, a dentist, relying upon 11 teeth recovered from the scene, positively identified the remains as those of Shipley.

Detective Randy Carreno testified that police had recovered a .22 caliber long rifle from Wilkins' parents' house. When questioned about Shipley's disappearance, Wilkins told Carreno that Shipley went to Texas; he later stated Shipley was heading to Florida. When Carreno informed Wilkins that police had found the pond where Shipley's remains were hidden, Wilkins said, "Out by my Mom's." Carreno also told Wilkins police had recovered the murder weapon; Wilkins replied that he already knew this because his mother had called and told him. When Wilkins was asked if he would like to see the weapon, he declined, stating he already knew what the rifle looked like.

On direct appeal, this court upheld Wilkins' convictions for first-degree premeditated murder, conspiracy to commit first-degree murder, and aggravated robbery; we reversed his conviction for conspiracy to commit aggravated robbery. 267 Kan. at 368.

In the 2003 motion underlying this appeal, Wilkins argued that his retained trial counsel, Carl. A. Fleming, was ineffective for (1) failing to hire or consider hiring an expert under *Mullins v. State*, 30 Kan. App. 2d 711, 716-18, 46 P.3d 1222, *rev. denied* 274 Kan. 1113 (2002), to challenge the State's dental forensics expert; (2) failing to file any formal discovery requests, instead relying on the prosecutor's open-file policy; (3) failing to investigate the criminal history of key witnesses; (4) failing to introduce evidence of the benefits key witnesses had received from the State in exchange for their testimony; and (5) failing to object to evidence, to perform any investigation in preparation of the defense, and failing to otherwise provide adequate representation. Wilkins also argued that the prosecutor withheld exculpatory evidence, specifically: (1) the grant of immunity given to Gray; (2) the results of Gray's polygraph tests; and (3) the plea agreement between the State and Bittle.

At the 2004 evidentiary hearing on the motion, Wilkins presented testimony from Fleming; Winter; Dr. Ronald E. Gier, a forensic odontologist; and Albert Lopes, Jr., a Douglas County criminal defense attorney.

Fleming testified that he voluntarily surrendered his license to practice law in 2000 in connection with various uncontested complaints filed with the disciplinary administrator. The complaints

were not related to the adequacy of his representation of Wilkins. Fleming also confirmed that he had filed no discovery requests with the prosecutor's office, relying on the prosecutor's open-file policy. Although he had received and reviewed more than 1,000 documents, Fleming was not aware that Gray had taken polygraph examinations or that the polygraph examiner concluded both times that Gray was being deceptive in answering questions about Shipley's death. Wilkins argued that the failures constituted violations of Gray's immunity agreement with the State. Fleming acknowledged that the failed polygraphs would have been exculpatory for his client and said that, had he known there was a problem with Gray's immunity agreement, he would have "done something about it." Fleming agreed, however, that polygraph examination results are not admissible evidence.

Fleming testified that he was aware the State had entered an agreement with Bittle and that he knew its terms; but he never saw the written agreement, did not request a copy of it, and did not introduce evidence concerning the benefit Bittle might have received as a result of the agreement.

Fleming also testified that he had not researched the criminal history of Bittle and Gray and had not attempted to impeach their credibility based on previous convictions. However, he testified that he did present evidence at Wilkins' trial that Bittle had attempted to implicate several innocent people in Shipley's murder and that Bittle and the Klan group were involved in illegal activities, including drugs, shoplifting, and prostitution.

Fleming did not consult with any experts in preparation for Wilkins' trial, and he did not cross-examine the State's dental expert, Winter. He admitted that he had no idea whether Winter's methodology or conclusions were sound or whether they could be challenged. He also said that he was "unable to fully understand [Winter's] forensic testimony." On cross-examination, Fleming said that his trial strategy did not involve contesting the identity of the remains. He further stated that, knowing what he knows now, he should have consulted an expert on the subject of dental identification, as well as an expert on the tape recordings Gray surreptitiously made of defendant.

Fleming also acknowledged that, although he knew there was a related federal investigation and contemporaneous investigations in Missouri and Iowa, he did not meet with or talk to any federal representatives or inquire into the Missouri investigation. He did contact Iowa authorities.

Finally, Fleming also testified that he was at a disadvantage at the time of Wilkins' trial in 1996 because he was a solo practitioner with no office staff or research assistance. This meant that he was "somewhat overwhelmed."

Gier testified that he had reviewed the evidence provided to Winter and had reviewed Winter's report and conclusion; he had looked at photographs, X-rays, and a trial transcript but not at the 11 teeth. In Gier's opinion, (1) Winter's methodology was not supported in the scientific community; (2) there was not enough evidence to make a positive identification of the remains; and (3) Winter's conclusions were not valid.

Winter testified that he had reviewed Gier's report and substantially agreed with it. Like Gier, he was unable to make positive identifications based only on photographs. But he said that his use of the teeth supported the conclusions of his report and trial testimony. Winter also defended his methodology and explained his conclusions, acknowledging that experts can disagree.

Lopes testified that a prosecutor has a duty to divulge any and all evidence, including exculpatory evidence, and that, even if a prosecutor follows an open-file policy, a defense attorney still should make a formal request for items such as criminal histories of State witnesses and should hire an investigator to access such information. Lopes testified that, in his view, Fleming's failure to do so was unreasonable. Lopes also testified that Fleming's failure to cross-examine Winter was "absolutely incredible" and that, unless defense counsel "happens to have a dental degree," failure to consult an expert for trial preparation and/or independent testimony is unreasonable. Lopes testified that he would have tried to get Gray's polygraph results and immunity agreement into evidence because they were crucial to the Wilkins' case. In addition, if Fleming felt overwhelmed by the case, Lopes said, he should have withdrawn, asked for additional time, or consulted a more

experienced attorney for assistance. Fleming's failure to do any of these things was unreasonable, and his deficiencies undermined Lopes' confidence in the jury's verdict.

On cross-examination, Lopes admitted that, if Fleming had pursued each of the avenues Lopes discussed at trial, Fleming would have been presenting eight inconsistent defenses on Wilkins' behalf. Lopes acknowledged that such an approach might have undermined the persuasiveness of the defense.

In its memorandum decision, with regard to Wilkins' ineffective assistance claim, the district judge stated generally that Fleming was "effective and sufficient" and "his representation was reasonable considering the circumstances." The judge also said Wilkins had failed to demonstrate prejudice arising from Fleming's performance, "particularly considering the totality and volume of the evidence which was presented at the trial. The death of the victim and his identity were not disputed. [Wilkins'] defense was [a] general denial and lack of participation. Expert testimony would play no significant role in developing this theory of defense."

On Wilkins' allegation that the prosecution had improperly withheld exculpatory evidence, the district judge noted Fleming's awareness that Gray had been granted immunity and the fact that evidence of the immunity was admitted at trial. In the district judge's view, the results of Gray's polygraph examinations did not constitute exculpatory evidence because they would not have been admissible. Wilkins thus failed to persuade the judge that he was entitled to relief on the *Brady* issue.

On appeal, a panel of our Court of Appeals saw things differently. Focusing on Fleming's failure to consult with or hire a dental expert and his failure to cross-examine the State's expert, it cited *State v. Orr*, 262 Kan. 312, 327, 940 P.2d 42 (1997), and *Mullins*, 30 Kan. App. 2d at 716, for the proposition that counsel has a duty to investigate and cannot make defensible strategic decisions until he or she has fulfilled that duty. *Wilkins*, slip op. at 5-7. The panel concluded:

"It is a reasonable trial tactic to limit cross-examination in hopes of keeping sensitive information from the jury. However, in this case, it appears that much of Fleming's inaction arose because he simply did not have the knowledge to

formulate appropriate questions and admitted that he had no defense to the expert testimony. In the absence of this identification, the only testimony which even suggested it was possible that Shipley was dead came from Gray and Mike Bittle, both of whom had much to gain by implicating Wilkins. Under these circumstances, Fleming's failure to cross-examine or mount a position adverse to the State can only be seen as a lack of preparation.

"We agree with Wilkins that Fleming's failure to refute the technical evidence in this case amounted to deficient performance." Slip op. at 6-7.

Turning to Fleming's failure to conduct formal discovery, the panel noted that Fleming's mere awareness that Gray was testifying under a grant of immunity was insufficient. Fleming should have looked at the document memorializing the immunity agreement and been aware that successful completion of polygraph examinations formed a condition precedent to the immunity. Fleming also did not know about the polygraph failures. Had he known that Gray exhibited deception on both exams, the panel reasoned, he "could have done more to attempt to impugn Gray's credibility." Slip op. at 8. Mere reliance on the prosecution's open-file policy was, in the panel's view, "deficient." Slip op. at 8.

Evaluating prejudice, the panel noted that Gray was the only witness who placed Wilkins at the scene of the crime, and, "due to Fleming's failures, the jury did not have any reason to question Gray's credibility." Slip op. at 9. Further, according to the panel, the identification of the remains rested solely on forensic evidence that Fleming, because of his deficient performance, was unable to challenge. The panel therefore ruled that Wilkins was entitled to reversal and remand for a new trial. Slip op. at 9.

The panel also accepted Wilkins' position on *Brady*. Although, given Fleming's reliance on the prosecution's open-file policy, the panel did not believe the State's failure to disclose Gray's polygraph results was likely to have been deliberate or the product of bad faith, it found that the evidence was clearly exculpatory and so material that its suppression was prejudicial. Citing *Brady*, 373 U.S. at 87, and *Giglio v. United States*, 405 U.S. 150, 154, 31 L. Ed. 2d 104, 92 S. Ct. 763 (1972), the panel concluded that Wilkins was entitled to reversal and remand for a new trial on this ground as well. *Wilkins*, slip op. at 10-11.

*K.S.A. 60-1507 Standard of Review*

A district court has three options for resolving a K.S.A. 60-1507 motion.

"First, it may determine that the motion, files, and records of the case conclusively show that the [movant] is entitled to no relief, in which case it will summarily deny the . . . motion. Second, the court may determine that a potentially substantial issue or issues of fact are raised in the motion, supported by the files and records, and hold a preliminary hearing after appointment of counsel to determine whether in fact the issues in the motion are substantial. Third, the court may determine from the motion, files, and records that a substantial issue or issues are presented, requiring a full evidentiary hearing with the presence of the [movant]." *Bellamy v. State*, 285 Kan. 346, Syl. ¶ 1, 172 P.3d 10 (2007).

Regardless of the form of the proceeding, the goal is to arrive at legal conclusions regarding whether (1) the judgment was rendered without jurisdiction, (2) the sentence imposed was not authorized by law or is otherwise open to collateral attack, or (3) there has been such a denial or infringement of the constitutional rights of the prisoner as to render the judgment vulnerable to collateral attack. *Bellamy*, 285 Kan. 346, Syl. ¶ 2.

The form of the proceeding in the district court dictates the standard of review applicable on appeal. If the district court disposed of the case summarily, the standard of review is de novo. *Bellamy*, 285 Kan. 346, Syl. ¶ 3. If the district court appointed counsel and held only a preliminary hearing, the appellate court applies a "findings of fact and conclusions of law standard of review to determine whether the findings are supported by substantial competent evidence and whether those findings are sufficient to support its conclusions of law. The district court's ultimate legal conclusion[s . . . are] reviewed . . . using a de novo standard." *Bellamy*, 285 Kan. 346, Syl. ¶ 4. If, as here, the district court conducted a full evidentiary hearing, the appellate standard of review mirrors that applied when the district court appointed counsel and held only a preliminary hearing. See *Bellamy*, 285 Kan. 346, Syl. ¶¶ 4, 5. Substantial evidence is evidence that possesses both relevance and substance and that furnishes a substantial basis of fact from which the issues can reasonably be resolved. *Sampson v. Sampson*, 267 Kan. 175, 181, 975 P.2d 1211 (1999). An appellate

court must accept as true the evidence and all inferences drawn from the evidence that tend to support the findings of the district judge. *Bledsoe v. State,* 283 Kan. 81, 88, 150 P.3d 868 (2007); *Graham v. State,* 263 Kan. 742, 753-54, 952 P.2d 1266 (1998).

## Effective Assistance of Counsel

The right to counsel under the Sixth Amendment to the United States Constitution is the right to effective assistance of counsel. *Chamberlain v. State,* 236 Kan. 650, 656-57, 694 P.2d 468 (1985) (adopting two-part test of *Strickland v. Washington,* 466 U.S. 668, 687, 80 L. Ed. 2d 674, 104 S. Ct. 2052, *reh. denied* 467 U.S. 1267 [1984]). To support his claim of ineffective assistance, Wilkins must prove that (1) counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result, and (2) counsel's deficient performance was sufficiently serious to prejudice the defense and deprive the defendant of a fair trial. *State v. Gleason,* 277 Kan. 624, 643, 88 P.3d 218 (2004); see *State v. Davis,* 277 Kan. 309, 314, 85 P.3d 1164 (2004); *Orr,* 262 Kan. at 317 (quoting *Strickland,* 466 U.S. at 687).

The first part of this test requires a defendant to show that counsel's representation fell below an objective standard of reasonableness. Judicial scrutiny of counsel's performance must be highly deferential, and a fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. A court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. *Gleason,* 277 Kan. at 644.

Once a defendant has established a deficient performance, he or she must also establish prejudice by showing that there is a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different. *Gleason,* 277 Kan. at 644.

In delineating its standard of review, the Court of Appeals recited that an appellate court reviews de novo the district court's

analysis of the two steps of this inquiry, which involve mixed questions of law and fact. *Wilkins*, slip op. at 3 (citing *State v. Mathis*, 281 Kan. 99, 110, 130 P.3d 14 [2006]).

Wilkins specifically argues that Fleming was ineffective for failing to hire or consider hiring a dental forensics expert to challenge Winter's testimony; for failing to make any formal discovery requests, instead relying on the prosecutor's open-file policy; for failing to investigate the criminal history of the key witnesses; and for failing to introduce evidence of the benefits the key witnesses had received from the State in exchange for their testimony. We address each of these complaints in turn.

Failure to Hire or Consider Hiring Dental Forensics Expert

This court has often held that the decisions of whether and how to conduct cross-examination and whether to call or not to call a certain witness are matters of trial strategy. See *State v. Ward*, 227 Kan. 663, Syl. ¶ 1, 608 P.2d 1351 (1980); *Winter v. State*, 210 Kan. 597, Syl. ¶ 2, 502 P.2d 733 (1972).

Relying on *Mullins v. State*, 30 Kan. App. 2d 711, 46 P.3d 1222, *rev. denied* 274 Kan. 1113 (2002), Wilkins argues that "defense counsel cannot make a strategic decision against pursuing a line of investigation when he or she has not yet obtained facts upon which that decision could be made." *Mullins*, 30 Kan. App. 2d at 716 (citing *Kenley v. Armontrout*, 937 F.2d 1298, 1308 [8th Cir. 1991]). "Further, when counsel lacks the information to make an informed decision due to inadequacies of his or her investigation, any argument of 'trial strategy' is inappropriate." *Mullins*, 30 Kan. App. 2d at 716-17 (citing *Clay v. State*, 954 S.W.2d 344, 349 [Mo. App. 1997]). We have no hesitation in agreeing with these general statements of the law from *Mullins* and have enunciated similar principles in our previous cases. Mere invocation of the word "strategy" does not insulate the performance of a criminal defendant's lawyer from constitutional criticism. See, *e.g.*, *Bledsoe*, 283 Kan. at 95. We must look to the totality of the circumstances to determine whether Fleming's performance in regard to retaining and using a dental forensics expert fell below the measure of objective reasonableness. See *Bledsoe*, 283 Kan. at 90-91.

*Mullins* involved a failure to employ an expert in the defense of a child sexual abuse prosecution. At trial, the State presented testimony from a nurse who said that the victim's physical examination was normal but that research, never identified to the jury, demonstrated that " 'physical indications of anal penetration were not present in 60 to 80 percent of the children sodomized.' " See *Mullins*, 30 Kan. App. 2d at 712. The defense lawyer did nothing to contest this testimony from the nurse, and he did not obtain an expert on interviewing of children suspected to be victims of sexual abuse.

At the movant's K.S.A. 60-1507 evidentiary hearing in *Mullins*, a criminal defense lawyer testified that an expert on child victim interviewing could have pointed out flaws in the interview process and could have enabled a defense challenge to the child victim's testimony without a direct attack on the child's credibility. This lawyer also said that the necessity of retaining such an expert was well known among members of the criminal defense bar at the time of the movant's trial.

Under these circumstances, the *Mullins* Court of Appeals panel ruled that the movant had carried his burden of demonstrating that his trial counsel's performance "so undermined the proper functioning of the adversary process that the trial cannot be relied on as having produced a just result. [Citation omitted.]" See *Mullins*, 30 Kan. App. 2d at 718. It noted: "We are compelled, primarily, on the essentially uncontroverted record at the [K.S.A. 60-]1507 hearing. For whatever reason, the State presented no evidence, no witnesses, and did little cross-examination of [movant's] witnesses to provide the trial court any support for determining [movant's] trial counsel was effective," thus explicitly limiting the applicability of its holding to the particular facts and procedural history of the case before it. 30 Kan. App. 2d at 718. Subsequent Court of Appeals cases have recognized this limitation. See *Lewis v. State*, 33 Kan. App. 2d 634, 111 P.3d 636, *rev. denied* 277 Kan. 924 (2003); *Hill v. Simmons*, No. 93,427, unpublished opinion filed October 28, 2005; *State v. Collins*, No. 90,792, unpublished opinion filed June 25, 2004, *rev. denied* 278 Kan. 848 (2004); *Bailey v. State*, Nos. 90,833, 90,836, unpublished opinion filed May 14, 2004, *rev.*

*denied* 278 Kan. 843 (2004); *Snavely v. State,* Nos. 89,156, 89,947, unpublished opinion filed October 23, 2003.

In this case, Fleming admitted at the K.S.A. 60-1507 hearing that he had no idea whether Winter's methodology or conclusions were sound or whether they could be challenged; and he was "unable to fully understand [Winter's] forensic testimony." He testified that, knowing what he knows now, he should have consulted an expert on the subject of identification of human remains from dental evidence. At trial, Fleming had lodged no objection to the Winter testimony, nor did he cross-examine.

Based on these facts alone, it is understandable that the Court of Appeals panel concluded that Fleming's failure to "consult with any forensic dental experts," despite his lack of knowledge in that field; his failure to "cross-examine or mount a position adverse"; and his failure to refute [Winter's] technical evidence" amounted to deficient performance under the first step of the test for ineffective assistance of counsel. *Wilkins,* slip op. at 6.

But there are additional facts, established by substantial competent evidence, to consider; and they can be read to support the district court result on this issue.

Fleming also testified at the K.S.A. 60-1507 hearing that he had "spent time with [Winter]" and had cross-examined him at Wilkins' preliminary hearing. (The record demonstrates that the district judge examined the preliminary hearing transcript, which has not been provided to this court.) It was Fleming's opinion based on his experience with Winter that Winter would hold up

"in front of the jury[.] I regarded him as a skunk in the building and I wanted him out as quickly as possible. I didn't want to make an issue of him. I didn't want to spend a lot of time with him. I knew what he was going to say and I - I didn't want him to be in front of the jury any longer than he had to be, so that's why he wasn't challenged."

We also consider it significant that Wilkins' story was that he had not been present for or had anything else to do with Shipley's murder. Fleming repeatedly stated that the defense did not involve contesting the identification of the remains as Shipley's.

Under the totality of circumstances and our standard of review, the question of whether Wilkins met his burden of demonstrating

unreasonable performance by Fleming on this issue is close. Even if we assume, however, that Wilkins succeeded on the first part of the test for ineffective assistance, he fell short on the second part. We see no prejudice. At the K.S.A. 60-1507 hearing, the expert testimony presented to challenge Winter did not actually include an assertion that the remains found at the pond were not Shipley's. It merely demonstrated a divergence of expert opinion on appropriate methodology.

Moreover, in this case—unlike *Mullins* where the child victim's testimony, impaired as it may have been by unchallenged coercive or suggestive interview techniques, was the *only* evidence that a crime occurred—there was a great deal of circumstantial and direct evidence aside from Winter's dental forensics testimony that Shipley was murdered and that Wilkins was at least one of his killers. Particularly damning were Wilkins' unprompted statements to law enforcement that showed he was aware of the location of the pond and the murder weapon—we see no reasonable probability that, but for what may be deemed Fleming's deficient performance on the dental forensics expert issue, the result of Wilkins' trial would have been different.

Failure to Conduct Discovery, Introduce Responses into Evidence

Fleming acknowledged that he failed to make any discovery requests, relying instead on the prosecutor's open-file policy. The district court concluded this did not constitute deficient performance; the Court of Appeals disagreed. Specifically, Wilkins alleges that Fleming's reliance on the open-file policy was prejudicial to the extent that he did not seek copies of the prosecution's written grant of immunity for Gray; its plea agreement with Bittle, which Fleming knew existed; or the results of Gray's polygraph examinations, which, unbeknownst to Fleming, Gray had failed. Wilkins also points to Fleming's failure to conduct any independent investigation into the criminal histories of Bittle and Gray and his failure to introduce evidence of the benefits received by those two men through their deals with the State.

The Court of Appeals panel stated that, had Fleming done any independent discovery, he could have "done more to attempt to

impugn Gray's credibility." *Wilkins*, slip op. at 8. "Given the fact that this case involved an off-grid felony, we do not believe it was reasonable to merely rely on an open file policy in lieu of actively defending Wilkins. Consequently, we believe Fleming's performance in this area was deficient." Slip op. at 8.

With regard to Fleming's failure to obtain and use written evidence of Gray's immunity, as the district court recognized, the fact that Gray had received immunity in exchange for his testimony was clearly established at trial. The jury would have well understood that Gray was receiving a substantial benefit from his testimony against Wilkins and that Gray had a substantial incentive to fabricate an engaging story in the service of the State's case. The agreement itself, other than its condition that Gray be truthful, would have added nothing to this understanding. Indeed, any emphasis on the existence of the condition that Gray's testimony be truthful would have tended to bolster rather than undercut his credibility before Wilkins' jury.

Regarding Fleming's failure to obtain and use a copy of the State's plea agreement with Bittle, our analysis is basically identical to the above. Fleming knew of the Bittle plea agreement, and it was discussed at some length throughout the trial. The jury was thus capable of taking the benefits of the agreement into account in assessing Bittle's credibility.

As to the written reports of Gray's polygraph examinations, they would not have been admissible in Wilkins' trial absent a stipulation. See *State v. Shively*, 268 Kan. 573, 579, 999 P.2d 952 (2000). Generally, neither would the fact that the examinations had been administered. See *State v. Webber*, 260 Kan. 263, 276, 918 P.2d 609 (1996), *cert. denied* 519 U.S. 1090 (1997). Although mere mention of a polygraph does not require a mistrial, *State v. Green*, 245 Kan. 398, 406, 781 P.2d 678 (1989), reference to such an examination, direct or indirect, is prohibited. *In re Care & Treatment of Foster*, 280 Kan. 845, 862, 127 P.3d 277 (2006).

Even if we were to overlook the problem of inadmissibility, we note that Wilkins' principal argument regarding the polygraph reports is unpersuasive. At oral argument, counsel relied upon the interview results recited in the two reports, which included re-

peated mention of Gray's statement that Shipley might not have been dead when Gray sank Shipley in the pond. Gray's belief on this point already came in at Wilkins' trial. Also, as both a practical and legal matter, additional proof that Gray's behavior in sinking Shipley may have contributed to Shipley's death would not have absolved Wilkins of the culpability that attached when he shot Shipley beforehand.

Wilkins also argues that Fleming's failure to investigate the criminal histories of Bittle and Gray was unreasonable and prejudicial. Wilkins relies on cases from the United States Court of Appeals for the Ninth Circuit and the Michigan Court of Appeals to argue that a criminal defendant is denied effective assistance of counsel when his or her lawyer fails to discover and capitalize upon prior criminal records to impeach the credibility of the State's key witnesses. See *Sanders v. Ratelle*, 21 F.3d 1446, 1456-61 (9th Cir. 1994); *People v. Nickson*, 120 Mich. App. 681, 684-87, 327 N.W.2d 333 (1982). Again, we do not dispute these basic principles of law. We agree that, in certain cases, a defense lawyer's failure to discover and use a witness' prior criminal record for impeachment may constitute ineffective assistance requiring a new trial. But neither this court nor our sister courts have adopted a bright-line rule necessitating reversal and retrial in such situations. We still analyze this alleged failure under the two steps governing analysis of an ineffective assistance claim.

Here, Fleming's failure to investigate the criminal histories of Bittle and Gray may have been unreasonable. Nevertheless, he repeatedly established the criminal involvements and untrustworthy characters of both. Fleming proved that Bittle and Gray were involved in illegal drugs, prostitution, theft, and child pornography, while Wilkins was not. Fleming also elicited testimony that Bittle was the leader of the Klan group, that Bittle had threatened to kill other members of the group, and that Bittle had offered to kill one member's stepfather and then tried to blackmail her about it. Fleming consistently contrasted the wayward lifestyle of the Iowa-based group with that of the Kansas-based Wilkins, who was the only one among the group who held a steady job. The evidence also showed that Bittle had told several inconsistent stories about

Shipley's disappearance: Shipley was killed in Iowa; Shipley's body was dumped from a jeep on a Kansas highway; Shipley had been hung in Kansas City; and Shipley was shot in Kansas and his body dumped in a pond.

In short, any effort that Fleming may have engaged in to obtain information about Bittle's and Gray's formal criminal records could not have made Bittle and Gray look much more unsavory and less worthy of belief than the evidence already before Wilkins' jury. Although Fleming's performance in relation to this issue may have been unreasonable, it could not have changed the outcome of the Wilkins' trial.

Wilkins also argues that Fleming failed to introduce evidence of the benefits Bittle and Gray received in exchange for their testimony against Wilkins. As discussed above in relation to Wilkins' criticism of the thoroughness of Fleming's discovery on Gray's immunity and Bittle's plea agreement and on both witnesses' criminal records, the record does not support the idea that Wilkins' jury was uninformed about any such benefits. In our view, there is no substantial competent evidence to support any conclusion that Fleming's performance was deficient in this respect.

In holding against Wilkins on his ineffective assistance of counsel claim, we also note that the district court judge who presided over the K.S.A. 60-1507 proceeding was the same judge who presided over Wilkins' trial. We have previously observed that substantial questions of fact about the performance of trial counsel "can best be evaluated by the judge who presided at trial." *Bellamy v. State*, 285 Kan. 346, 357, 172 P.3d 10 (2007). Here, under our standard of review we are comfortable that the district court arrived at the correct legal conclusions, supported by substantial competent evidence, on Wilkins' Sixth Amendment issue.

### Disclosure of Exculpatory Evidence

Wilkins also argues that the prosecutor committed misconduct by withholding exculpatory evidence, specifically the Gray grant of immunity, the Bittle plea agreement, and the reports of Gray's polygraph tests.

A prosecutor's withholding of exculpatory evidence is misconduct that implicates constitutional rights, regardless of the prosecutor's good or bad faith. See *Brady v. Maryland*, 373 U.S. 83, 87, 10 L. Ed. 2d 215, 83 S. Ct. 1194 (1963). There are "three components or essential elements of a *Brady* prosecutorial misconduct claim: 'The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued.'" *Banks v. Dretke*, 540 U.S. 668, 691, 157 L. Ed. 2d 1166, 124 S. Ct. 1256 (2004) (quoting *Strickler v. Greene*, 527 U.S. 263, 281-82, 144 L. Ed. 2d 286, 119 S. Ct. 1936 [1999] ); *Haddock v. State*, 282 Kan. 475, 506-507, 146 P.3d 187 (2006). As this court has outlined the analysis:

" ' "When the withholding of evidence by the prosecution is not deliberate and in bad faith and when the prosecution has not refused to honor a request for the evidence made at a proper stage of the proceedings, a defendant should be granted a new trial only if the record establishes that: (1) the evidence was withheld or suppressed by the prosecution; (2) the evidence was clearly exculpatory; and (3) the evidence was so material that its omission from the trial was clearly prejudicial to the defendant." [Citation omitted.]' " *State v. McCarty*, 271 Kan. 510, 514, 23 P.3d 829 (2001) (quoting *Taylor v. State*, 251 Kan. 272, 293-94, 834 P.2d 1325 [1992]).

Wilkins' first obstacle to obtaining relief on this issue is procedural. He is required to show exceptional circumstances excusing his failure to raise it at trial or on direct appeal. See Supreme Court Rule 183(c) (2007 Kan. Ct. R. Annot. 243); *Bledsoe v. State*, 283 Kan. 81, 88, 150 P.3d 868 (2007); *Johnson v. State*, 271 Kan. 534, 535, 24 P.3d 92 (2001). We have said that a movant in Wilkins' position can overcome a procedural default, *i.e.*, a failure to raise an issue at trial or on direct appeal, by persuading the court that there was (1) ineffective assistance of trial counsel; (2) ineffective assistance of direct appeal counsel; or (3) newly discovered evidence or an unforeseeable change in circumstances or constitutional law unknown to counsel and the movant at the time of trial and direct appeal. *Bledsoe*, 283 Kan. at 88-89.

Fleming testified at the K.S.A. 60-1507 hearing that he had received more than 1,000 documents from the prosecutor under the open-file policy, and he could not verify all of the contents of his file because it had since been destroyed. The trial transcript makes clear, however, that he was at least generally aware of Gray's immunity and Bittle's plea agreement; both were discussed in some detail before the jury. We therefore hold that, even if Wilkins could prove that the prosecution failed to disclose the documents memorializing the Gray and Bittle deals, this failure cannot support Wilkins' *Brady* claim, raised for the first time on his K.S.A. 60-1507 motion. The defense was aware at the time of trial of at least the probable existence of the documents; it was aware of their essential contents; and it capitalized upon its awareness. There are no exceptional circumstances excusing Wilkins' failure to make that part of his *Brady* argument dependent upon these documents at trial or on direct appeal.

The situation is different on the reports of Gray's polygraph examinations. Fleming was certain that the reports were not among the documents he reviewed in preparation for Wilkins' trial. Thus there is substantial competent evidence in the record that the State failed to produce the reports to the defense pursuant to the prosecutor's open-file policy. This satisfies the first component of a *Brady* claim.

Wilkins also can demonstrate that the reports were exculpatory; the examiner's conclusions that Gray was deceptive had a tendency to discredit him generally and a tendency to discredit him specifically on whether he had participated personally in causing Shipley's death. We have held that evidence tending to discredit a key prosecution witness is exculpatory and should be disclosed by the State. *State v. Kelly*, 216 Kan. 31, 36-37, 531 P.2d 60 (1975) (quoting *Giglio v. United States*, 405 U.S. 150, 31 L. Ed. 2d 104, 92 S. Ct. 763 [1972]).

Even then, however, Wilkins must also show that the evidence was material, *i.e.*, that the failure to disclose it was prejudicial to his case. "[E]vidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. 'A reasonable

probability is a probability sufficient to undermine the confidence of the outcome.' [Citation omitted]." *Haddock*, 282 Kan. at 507. This is where Wilkins' *Brady* claim breaks down. As discussed above, polygraph results are inadmissible in Kansas. See *Shively*, 268 Kan. at 579. Moreover, even if admissible, the reports would not have exonerated Wilkins. Their principal value was mere reinforcement of evidence already before the jury on Gray's doubt about whether Shipley had died between the shooting and the sinking in the pond. This would not have been enough to prompt the jury to arrive at a not guilty verdict on Wilkins.

### Conclusion

In view of all of the foregoing, Wilkins is not entitled to reversal of his convictions or retrial because of ineffective assistance of trial counsel and/or evidence withheld by the prosecutor.

The decision of the Court of Appeals is therefore reversed. The decision of the District Court is therefore affirmed.

DAVIS and JOHNSON, JJ., not participating.

GREENE, J., and LARSON, S.J., assigned.