NOT DESIGNATED FOR PUBLICATION

No. 121,885

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

AARON MICHAEL ALVAREZ,
*Appellant*,

v.

STATE OF KANSAS,
*Appellee*.

MEMORANDUM OPINION

Appeal from Reno District Court; TIMOTHY J. CHAMBERS, judge. Opinion filed November 25, 2020. Affirmed.

*David L. Miller*, of Ney, Adams & Miller, of Wichita, for appellant.

*Keith E. Schroeder*, district attorney, and *Derek Schmidt*, attorney general, for appellee.

Before POWELL, P.J., GREEN and STANDRIDGE, JJ.

PER CURIAM: A jury convicted Aaron Michael Alvarez of second-degree intentional murder. The district court sentenced Alvarez to 186 months in prison. This court affirmed Alvarez' conviction and sentence on direct appeal. He timely filed a K.S.A. 60-1507 motion following his direct appeal. In his motion, Alvarez alleged various ineffective assistance of counsel claims by both trial counsel and appellate counsel. He also asserted a newly discovered evidence claim. Alternatively, Alvarez alleged that the State wrongly withheld this new evidence in the underlying criminal case in violation of *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963). The district court denied the motion following a full evidentiary hearing, and Alvarez

1

timely appealed the decision. Because we find substantial competent evidence supports the district court's decision to deny Alvarez' motion, we affirm.

FACTS

After a four-day jury trial, Alvarez was convicted of second-degree intentional murder in the stabbing death of Allen Frank. The district court imposed an aggravated sentence of 186 months' imprisonment. Chief Public Defender Sarah McKinnon represented Alvarez throughout his criminal proceedings. Alvarez appealed his conviction and sentencing. Korey Kaul, an attorney with the Kansas Appellate Defender Office, represented Alvarez on the direct appeal. A panel of this court affirmed his conviction and sentence. *State v. Alvarez*, No. 109,675, 2014 WL 5611618, at *12 (Kan. App. 2014) (unpublished opinion). The following facts are taken directly from the Court of Appeals opinion:

"On November 23, 2011, Alvarez, Frank, Jessica Roberts, Lakisha Magee, and Anthony Liptow were at a local bar in Hutchinson. The group had been drinking alcohol all day. Alvarez was purportedly intoxicated and kicked out of the bar after becoming belligerent. The group subsequently left the bar in a vehicle driven by Liptow to take Alvarez back to a house rented by Daniel Montiel and Siomara Duran, where Alvarez and his girlfriend, Roberts, had begun staying in the basement a few days earlier. On the way, Alvarez and Roberts began arguing. The argument turned physical; Alvarez began hitting and choking Roberts seated behind him. Magee, who sat next to Roberts, dove in front of her and was also hit several times by Alvarez.

"Liptow testified that Alvarez would not respond to his request to calm down. When the group arrived at the house, Liptow observed Alvarez get out of the vehicle and go up to the back door and begin banging on it. Liptow then observed Montiel come out of the house looking 'pretty [upset].' Liptow stated that after he observed Alvarez go inside the house, he and Frank got out of the vehicle and followed Alvarez to go 'check on him' and 'make sure he was okay.' Once Liptow ensured Alvarez got in the house okay, he went back to his vehicle and left with Roberts and Magee. During cross-examination, Liptow testified that he believed Frank was angry while the pair followed

2

Alvarez to the house. Liptow also stated Frank went by the nickname 'Ali' and that he had referenced 'Mohammad Ali' and claimed to be a Golden Gloves boxer during a previous discussion about his nickname.

"Magee also testified that Frank went by the street name 'Ali' and that he had been involved with Golden Gloves 'for a while.' Magee stated Frank was angry at Alvarez for hitting her and also beating up Roberts in front of him. Magee asserted that Frank got out of the car and 'chased' Alvarez in the house. During redirect, Magee acknowledged that she had told police that Frank and Liptow had 'followed' Alvarez to the house. Then Magee stated that everyone just walked into the house and nobody came back out of the door. Magee acknowledged that despite Frank being angry with Alvarez, she did not observe him attempt to hit or tackle Alvarez after getting out of the car.

"Montiel testified that he, Duran, their son, and his nephew were in the living room watching television when they heard someone banging loudly on the back door to the house. When Montiel opened the door, Alvarez came in and immediately went to the bathroom. Montiel thought Alvarez had been drinking. While Alvarez was in the bathroom, Frank came inside the house. Montiel observed that Frank was upset or angry, and he began explaining to him that Alvarez had hit Roberts and Magee while they were in the vehicle. Montiel stated that when Alvarez came out of the bathroom, he and Frank began having a loud discussion or argument about what had happened in the vehicle. Montiel had told them both to go downstairs.

"Montiel, Alvarez, and Frank all went downstairs. As they went down the stairs, Montiel stated Alvarez punched a metal heating vent after being told to calm down. Once in the basement, Montiel observed Frank and Alvarez begin arguing over Alvarez hitting Magee. Montiel testified he observed Alvarez punch Frank in the face, after which the pair then began to throw punches at one another. During redirect, Montiel characterized Frank's actions in response to being punched as an attempt 'to defend himself.' Montiel told the police Alvarez and Frank were wrestling and that he never witnessed Frank throw a punch at Alvarez.

"Montiel then observed the two men separate, and Alvarez had a knife in his hand. Montiel told the police that Frank stepped towards Alvarez and said, 'What are you going to do, shank me?' To which Alvarez responded, 'I'll kill you.' During trial, Montiel characterized Alvarez' response to Frank's question as saying, 'Like he didn't care, you know, about killing anybody and stuff like that.' Montiel testified that when Frank stepped towards Alvarez, Alvarez responded by swinging the knife towards Frank's neck

and then thrusting the knife toward Frank's stomach. Montiel told the police that when Frank stepped towards Alvarez asking him if he was going to shank him, Alvarez 'stepped towards [Frank] and stabbed him in the stomach.'

"Montiel testified he repeatedly told Alvarez after the stabbing to give him the knife and he refused. Montiel told the police that his focus at that moment was on the knife because he did not know where Frank had gone after being stabbed and he was concerned what Alvarez was going to do to him because Alvarez 'was upset with him, also.' Montiel subsequently found Frank in the utility room lying on the floor with a pale complexion. Montiel stated Alvarez appeared briefly and told him Frank 'was faking it.' Montiel told the police that Alvarez said that Frank was 'just playing around' and 'he's not really hurt.'

"Montiel examined Frank and located a stab wound to his stomach and a slash wound to his neck. Meanwhile, Duran had heard a loud noise and gone downstairs, where she found Frank lying on the floor. Duran testified she told Montiel not to touch Frank and call the police and that Alvarez looked scared. Duran then told Alvarez not to go anywhere. Montiel ran to the neighbor's house and called 911. Duran stated that while she was checking on Montiel she observed Alvarez appear at the front of the house and then take off running to the backyard away from the house when he saw Montiel on the telephone.

"Scott Kipper, M.D., the Sedgwick County medical examiner, testified to the injuries Frank sustained. In addition to a contusion on his head, a laceration under his left eyebrow, several scattered abrasions on his face and scalp, and some abrasions on his left forearm and finger, Frank suffered a sharp force injury or wound approximately 4 inches long to the right side of the neck. Frank had also been stabbed in the stomach with such force that the object penetrated his colon, nicked the aorta causing massive internal bleeding, and then struck the vertebra in his back causing a wound. The stab wound to Frank's stomach caused his death.

"Officer Josh Radloff and Detective Tyson Meyers of the City of Hutchinson Police Department testified to the subsequent investigation. The police searched the house and immediate vicinity and could not locate Alvarez or the weapon used on Frank. Several hours after the incident, officers located and arrested Alvarez in a cottage next door to the house Frank lived. The murder weapon was never recovered.

"Detective Meyers testified that Alvarez waived his *Miranda* rights at the police station. During the ensuing interview with the Kansas Bureau of Investigations agent,

4

Alvarez repeatedly wanted to know why he had been arrested, claimed he had not been involved in anything, and said he did not remember being in a fight or stabbing anyone. When the investigators observed a cut on Alvarez' hand, he was asked whether he carried weapons; Alvarez denied doing so. Alvarez was argumentative throughout the interview and repeatedly made 'smart aleck' comments. Alvarez never claimed he had to use a knife to defend himself from Frank.

"After the close of the State's case-in-chief, Alvarez took the stand and testified on his own behalf. He considered Frank his friend and referred to him as 'Ali.' When asked how Frank got this nickname, Alvarez stated Frank 'was a Golden Gloves Boxer and he's just known for always getting into fights and winning and just being, just a big bad dude.' As to the incident in Liptow's vehicle, he testified that he remembered somebody in the backseat was throwing stuff at him and that he had been arguing with Roberts. He claimed to have blacked out after having been scratched and punched in the back of the head and did not remember physically fighting Roberts or hitting either her or Magee. Alvarez claimed this black out session ended the moment they arrived at his house and he jumped out of the vehicle.

"Alvarez testified that when he got out of the car Frank followed him up to his house angrily yelling threats such as, '[W]hy you hit my girl. I'm going to beat you like you did her.' He described banging on the door, entering the house, and going straight to the bathroom. Alvarez stated he then went down to the basement, after which he heard Montiel and Frank follow him down the stairs. He claimed Frank then confronted him about hitting Magee and threatened to mess him up. Alvarez said he began yelling back telling Frank he did not know what had happened. After which, he apologized and asked Frank to leave. Alvarez stated he then punched Frank in the face because Frank jumped at him 'like he was going for my throat.'

"Alvarez acknowledged the two men then began to wrestle. While wrestling, Alvarez felt Frank was trying to 'choke him out.' The two finally separated, and Frank 'backs up a little bit.' Alvarez stated he pulled out a knife because he was scared and held it out in front of himself telling Frank to leave him alone. Frank responded by asking him, 'What are you going to do, shank me?'

"Alvarez then testified that Frank jumped forward at him a second time and he swung his knife left to right in a slashing motion, probably hitting Frank's neck. Frank stepped back telling him, 'I'm going to fuck you up,' and then jumped at him again.

Alvarez testified he stepped back and stabbed the knife out in front of him, feeling it enter Frank. He stated he was only trying to scare Frank. Alvarez then left the scene.

"Frank's mother, Kimberly Frank, testified on rebuttal regarding her son's nickname and purported boxing experience. Kimberly stated Frank's nickname was 'Alley,' which was short for 'Allen,' and he had never been involved in Golden Gloves or boxing." *Alvarez*, 2014 WL 5611618, at *1-4.

After the mandate issued in his direct appeal, Alvarez filed a timely motion pursuant to K.S.A. 60-1507 with the help of attorney Richard Ney. In the motion, he alleged 18 different ineffective assistance of counsel claims against McKinnon, 3 ineffective assistance of counsel claims against Kaul, and cumulative error. Of the 18 claims against McKinnon, only 7 are relevant to this appeal. Of the three claims against Kaul, only two are relevant to this appeal. The district court appointed counsel to represent Alvarez, but David Miller (who practiced in the same firm as Ney) entered his appearance to represent Alvarez' in the habeas proceedings.

The district court held an evidentiary hearing on Alvarez' motion. The same district court judge who presided over the jury trial also presided over this habeas proceeding. Alvarez called five witnesses to testify on his behalf: (1) McKinnon; (2) Dr. Marilyn Hutchinson, a licensed psychologist; (3) Kaul; (4) Christopher Villela, an alleged newly discovered eyewitness to the murder; and (5) Roberts, Alvarez' girlfriend at the time of the murder. Aside from cross-examining four of these witnesses, the State called no witnesses and introduced no additional evidence contesting Alvarez' habeas claims. At the close of evidence, the district court ordered the parties to submit proposed findings of fact and conclusions of law for the court to consider. Miller informed the court at that time that no further oral argument would be necessary and that he would submit the matter through written argument.

Alvarez filed a memorandum of law setting forth his written arguments as ordered by the district court. Alvarez used his memorandum to reframe some of the key

ineffective assistance of trial counsel issues that were set forth in his original motion. Alvarez also alleged that he discovered a new witness who was present the night of the murder, who was never located and called to testify, and who could potentially discredit the State's lone eyewitness. In addition, Alvarez added a *Brady* violation claim arguing that the State withheld impeachment evidence showing that it offered David Montiel, the lone eyewitness to the stabbing, legal residency in exchange for his testimony at trial. Finally, Alvarez alleged cumulative error. The ineffective assistance of counsel claims against Kaul remained the same. After the State filed a response, the district court issued a lengthy order denying Alvarez' K.S.A. 60-1507 motion. Alvarez appeals.

ANALYSIS

After a full evidentiary hearing on a K.S.A. 60-1507 motion, the district court must issue findings of fact and conclusions of law concerning all issues presented. Supreme Court Rule 183(j) (2020 Kan. S. Ct. R. 223). An appellate court reviews the district court's factual findings to determine whether they are supported by substantial competent evidence and are sufficient to support the court's legal conclusions. Appellate courts review the district court's ultimate legal conclusions de novo. *Fuller v. State*, 303 Kan. 478, 485, 363 P.3d 373 (2015); *Wilkins v. State*, 286 Kan. 971, 980, 190 P.3d 957 (2008). Substantial evidence is evidence that possesses both relevance and substance and that furnishes a substantial basis of fact from which the issues can reasonably be resolved. An appellate court must accept as true the evidence and all inferences drawn from the evidence that tend to support the findings of the district judge. 286 Kan. at 980-81.

For purposes of our analysis, we group Alvarez' claims on appeal into the following four categories:  ineffective assistance by trial counsel, ineffective assistance by appellate counsel, newly discovered evidence in the context of a *Brady* violation, and cumulative error.

7

A. *Ineffective assistance of counsel claims relating to McKinnon*

Alvarez claims that McKinnon was ineffective for six reasons: (1) she failed to request a defense of dwelling instruction, (2) she failed to investigate and present a mental disease and defect defense, (3) she failed to investigate and present evidence of Frank's violent character, (4) she failed to suppress or redact Alvarez' statement to police, (5) she failed to consult with and hire a toxicologist to support Alvarez' voluntary intoxication claim, and (6) she failed to interview and call certain witnesses to support Alvarez' self-defense and voluntary intoxication theories.

The right to counsel under the Sixth Amendment to the United States Constitution is the right to effective assistance of counsel. *Wilkins*, 286 Kan. at 981. To prevail on his ineffective assistance of counsel claim, Alvarez must establish by a preponderance of the evidence that (1) McKinnon's performance was deficient under a totality of the circumstances and (2) he was prejudiced. See *Sola-Morales v. State*, 300 Kan. 875, 882, 335 P.3d 1162 (2014) (relying on *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 [1984]); Supreme Court Rule 183(g) (preponderance burden).

The deficient performance part of this test requires a defendant to show that counsel's representation fell below an objective standard of reasonableness. So in this case, Alvarez must establish that McKinnon's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a fair and just result. See *Wilkins*, 286 Kan. at 981. Judicial scrutiny of counsel's performance must be highly deferential, and a fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. *State v. Kelly*, 298 Kan. 965, 970, 318 P.3d 987 (2014); *Crowther v. State*, 45 Kan. App. 2d 559, 564, 249 P.3d 1214 (2011). A court must indulge a strong presumption that counsel's conduct falls within the

8

wide range of reasonable professional assistance. *Kelly*, 298 Kan. at 970. If counsel made a strategic decision after making a thorough investigation of the law and the facts relevant to the realistically available options, then counsel's decision is virtually unchallengeable. Strategic decisions made after a less than comprehensive investigation are reasonable precisely to the extent that reasonable professional judgment supports the limitations on the investigation. *State v. Cheatham*, 296 Kan. 417, 437, 292 P.3d 318 (2013) (quoting *Strickland*, 466 U.S. at 690-91). Kansas appellate courts also have recognized that when the district court judge who presided over the K.S.A. 60-1507 proceeding was the same judge who presided over a defendant's trial, the district court judge is in the best position to evaluate any substantial questions of fact about trial counsel's performance at trial. *Wilkins*, 286 Kan. at 988; *Bellamy v. State*, 285 Kan. 346, 357, 172 P.3d 10 (2007).

Once a movant has established deficient performance, he or she must also establish prejudice by showing that there is a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different. *Wilkins*, 286 Kan. at 981.

1. *McKinnon's failure to request defense of dwelling instruction*

Alvarez first argues that McKinnon was ineffective for failing to request a defense of dwelling instruction at trial. Specifically, he asserts that he was entitled to such an instruction because Frank was the initial aggressor, Frank unlawfully pursued him into his home and remained there, Alvarez had a reasonable belief that he needed to use deadly force to defend himself in his home, and Alvarez had no duty to retreat at that point. He opines that McKinnon's failure to request this instruction constitutes deficient performance, and but for that failure, there is a reasonable probability the outcome of his trial would have been different.

9

The district court found that Alvarez failed to establish McKinnon was deficient because he failed to establish he was entitled to the instruction. The court found the evidence showed that Frank did not unlawfully or forcefully enter Alvarez' residence. As such, the district court stated it would not have given such an instruction at trial.

A criminal defendant generally is entitled to an instruction on the law applicable to his or her theory of defense if the instruction would be both legally and factually appropriate. The latter requires that there is sufficient evidence, viewed in the light most favorable to the defendant, for a rational fact-finder to find for the defendant on that theory. *State v. Dupree*, 304 Kan. 377, 397, 373 P.3d 811 (2016); *State v. Anderson*, 287 Kan. 325, 334, 197 P.3d 409 (2008).

A self-defense instruction may be warranted if there is any evidence tending to establish self-defense even though the evidence may be slight and consist solely of the defendant's testimony. See *Anderson*, 287 Kan. at 334. To establish that McKinnon was deficient, Alvarez must first show he was entitled to an instruction on a defense of dwelling theory. To show he was entitled to this defense, Alvarez had to provide sufficient evidence that he was justified in using deadly force to prevent or terminate unlawful or forceful entry into his dwelling. And to justify his use of deadly force, Alvarez had to show he had a reasonable belief such force was necessary to prevent imminent death or great bodily harm to himself. See K.S.A. 2011 Supp. 21-5223(b); see also K.S.A. 2019 Supp. 21-5224(a) (reasonable belief that deadly force is necessary is presumed where person against whom the force is used at the time the force is used: [1] is unlawfully entering or has unlawfully or forcefully entered and is present within the dwelling and [2] the person using the force knows or has reason to believe that fact).

Notably, however, a "reasonable belief" requires both a subjective and objective belief. So Alvarez had to establish (1) that he truly believed deadly force was necessary and (2) that a reasonable person in Alvarez' position would have believed such force was

10

required. See *State v. McCullough*, 293 Kan. 970, 975, 270 P.3d 1142 (2012). The Kansas Supreme Court has clarified that the objective standard of proof in the self-defense test may not rest on a defendant's uncorroborated statements alone; appellate courts evaluate the evidence presented by the defendant in light of the totality of the circumstances. *State v. Gonzalez*, 282 Kan. 73, 112, 145 P.3d 18 (2006).

Further complicating the defense of dwelling analysis is the no-duty-to-retreat rule. Under this rule, a person who lawfully is defending his or her dwelling has no duty to retreat when that person is not engaged in unlawful activity and is attacked in a place where such person has a right to be. See K.S.A. 2019 Supp. 21-5223(c); K.S.A. 2019 Supp. 21-5226. So although a defense of dwelling instruction is generally not available to a person who initially provokes the use of any force, an initial aggressor may be entitled to use any force if the initial aggressor can prove: (1) there were reasonable grounds to believe the aggressor was in imminent danger of death or great bodily harm and exhausted every reasonable means other than use of deadly force to escape such danger or (2) the initial aggressor withdrew from physical contact in good faith and clearly indicated that desire to withdraw, but the other assailant continued to use force. K.S.A. 2019 Supp. 21-5226(b) and (c) (The justification described in K.S.A. 2019 Supp. 21-5223 "is not available to a person who . . . initially provokes the use of any force against such person or another.").

Although only briefly, McKinnon did suggest to the district court that a defense of dwelling instruction might be an option. But the court responded that the instruction is not an option based on the evidence that already had been presented at trial. There was no other mention of proposing or using a defense of dwelling instruction at trial.

Turning to the first step of the *Strickland* analysis, this court must determine whether McKinnon was deficient for failing to request a defense of dwelling instruction. This argument turns on whether Alvarez was indeed entitled to such an instruction, which

requires an analysis of the defense of dwelling requirements. Turning to that analysis, the first issue is whether Alvarez resided or had a right to be at Montiel's residence. Alvarez and his girlfriend had been living in the basement of Montiel's home for almost two weeks at the time of the murder. While there was an agreement that Alvarez would pay half the rent and utilities with Montiel, the record shows that as of November 23, 2011, Alvarez had not yet had a chance to do so. Alvarez also did not have a key to Montiel's residence, so when the doors to the home were locked, Alvarez had to knock to be let in. Nevertheless, most witnesses who testified at trial stated an opinion that Alvarez lived in Montiel's basement at the time of the murder. Therefore, Alvarez likely resided there and had a right to be there.

The second issue is whether Frank unlawfully or forcefully entered Montiel and Alvarez' residence. The evidence presented at the jury trial established that on the way home from the bar, Alvarez became angry and started hitting Roberts in the backseat. Lakisha Magee, Frank's girlfriend at the time, tried shielding Roberts from the blows, and Alvarez hit Magee in the process. When the car pulled up to Montiel's residence, Alvarez jumped out of the car and marched up to the back door. He started banging on the door because it was locked and he did not have a key. While Alvarez was doing so, Frank and the driver, Anthony Liptow, got out of the car and followed Alvarez to the door. Magee and Alvarez both testified that Frank was angry with Alvarez at that point and may have threatened to beat up Alvarez. However, the record shows that Frank did not attempt to attack Alvarez in any way while they were outside. In fact, Frank stood near Alvarez while Alvarez knocked on the door. Montiel eventually answered the door. Alvarez went inside, removed his shirt, and went to the bathroom. Meanwhile, the record shows that Montiel let Frank inside and that Liptow left at some point with Magee and Roberts. While Alvarez was in the bathroom, Frank and Montiel discussed what happened in the car on the way to Montiel's house. This discussion took place in the kitchen or dining room. When Alvarez came out of the bathroom, he and Frank started talking about the

incident loudly with one another. Montiel told them both to go downstairs because they were being loud and disturbing Montiel's family. Frank and Alvarez complied.

Based on these facts, there no is indication that Frank unlawfully or forcefully entered or remained in the residence. Montiel, the individual whose name was actually on the lease for the home, invited Frank in. When Montiel told Frank and Alvarez to go downstairs, Alvarez made no objection or attempt to prevent Frank from following him down there. Consequently, Alvarez would not have been entitled to a defense of dwelling instruction.

Even if Alvarez established that Frank unlawfully or forcefully entered or remained in his dwelling, he still is unable to show he had a reasonable belief that use of deadly force was justified against Frank. As a panel of this court previously found, Alvarez cannot satisfy either the subjective or objective part of this test because he cannot show that a reasonable person in the same circumstances would have believed it was necessary to stab and kill Frank to defend himself. See *Alvarez*, 2014 WL 5611618, at *6 (citing *McCullough*, 293 Kan. at 975). The record indicates that Alvarez was the initial aggressor. Frank was unarmed. It is undisputed that Alvarez threw the first punch after Frank and Alvarez engaged in a brief verbal argument. Up to that point, Frank never attempted to attack Alvarez. After Alvarez hit him in the face, the two men started wrestling. Montiel characterized this wrestling as Frank's attempt to defend himself. After the two separated, Alvarez made no attempts to withdraw or escape from any perceived danger as required by K.S.A. 2011 Supp. 21-5226(c). Rather, he escalated the situation by drawing a knife. When Frank asked if Alvarez was going to shank him with the knife, Alvarez responded with the words, "I'll kill you."

Yet Alvarez asks this court to find that Frank was the initial aggressor when he pursued Alvarez into the house and threatened to beat him up. Alvarez claims that because Frank was the initial aggressor, he had no duty to retreat once the fight ensued in

the residence. However, even if this were true, this argument still ignores the fact that Alvarez' use of deadly force was unjustified to combat Frank's merely verbal threats. See K.S.A. 2019 Supp. 21-5221(a)(1) and (b) (noting that "use of force" includes verbal threats but does not necessarily justify use of deadly force to combat); K.S.A. 2019 Supp. 21-5222(a) (to be read in conjunction with K.S.A. 2019 Supp. 21-5221[b]). Alvarez' argument accordingly fails.

Because Frank did not unlawfully enter the residence and because Alvarez did not have a reasonable belief to justify the use of deadly force against Frank, Alvarez was not entitled to a defense of dwelling instruction. Accordingly, McKinnon could not have been deficient for failing to request such an instruction. Not only are the district court's factual findings as to this point supported by the substantial competent evidence in the record, but these findings support the court's conclusion that McKinnon was not deficient. Because Alvarez fails to establish that McKinnon was ineffective here, we find the district court correctly denied his K.S.A. 60-1507 motion as to this claim.

2. *Failure to investigate and present mental disease or defect defense*

Alvarez next argues that McKinnon was ineffective for failing to investigate and present a mental disease or defect defense. Specifically, he argues that McKinnon should have investigated his mental health issues more thoroughly before trial. Had she done so and had she requested that he obtain a psychological evaluation, he asserts that McKinnon would have learned he suffered from several mental health disorders that likely impacted his ability to form an intent to murder Frank. Because she failed to do so and because she failed to present any expert testimony as to this issue, Alvarez asserts that McKinnon's performance was deficient and that he was prejudiced by her deficiency.

K.S.A. 2019 Supp. 21-5209 provides that a defendant's mental disease or defect is an affirmative defense to any crime that may be charged against that defendant. However,

the defense only establishes whether the defendant lacked the requisite culpable mental state to commit the crime charged. See K.S.A. 2019 Supp. 21-5209. Usually, trial counsel's decision to elect a particular defense theory or to call or not call certain witnesses is considered valid trial strategy. *Wilkins*, 286 Kan. at 982; see *State v. Hedges*, 269 Kan. 895, 916, 8 P.3d 1259 (2000). But defense counsel cannot make a strategic decision against pursuing a line of investigation when he or she has not yet obtained the facts upon which that decision could be made. Further, when counsel lacks the information to make an informed decision due to inadequacies of his or her investigation, any argument of trial strategy is inappropriate. *Mullins v. State*, 30 Kan. App. 2d 711, 716-17, 46 P.3d 1222 (2002). However, this analysis differs slightly in cases where the issue is whether to pursue a mental disease or defect defense theory. This is because such a decision rests solely with the defendant and is not a strategic one left to counsel's discretion. See *Hedges*, 269 Kan. at 916.

In support of his claim, Alvarez presented the testimony Dr. Marilyn Hutchinson at the K.S.A. 60-1507 hearing. She conducted a full psychological evaluation of Alvarez at habeas counsel's request. Dr. Hutchinson diagnosed Alvarez with polysubstance abuse, ADD, hyperactivity, PTSD from childhood abuse and violence in school, major depression, and personality disorder. She testified that these diagnoses had a conglomerate impact on Alvarez' ability to think and control his emotions and behaviors; specifically, his mind ordered him to engage in behaviors without conscious thought or decision. Notwithstanding Dr. Hutchinson's testimony, the district court found McKinnon was not ineffective for failing to investigate and present a mental disease or defect defense:

> "Petitioner alleges Sarah McKinnon's [performance] was deficient in that she did
> not investigate or present evidence in support of a mental disease o[r] defect defense. The
> Petitioner had no history of mental illness other than ADHD. Ms. McKinnon went over

15

possible defenses with the Petitioner and no indication was given such a defense was factually supported or reasonable.

"Petitioner presented the testimony of Dr. Marilyn Hutchinson who testified as to her expertise in the Battered Woman Syndrome. She indicated the Petitioner was an abused child and compared his childhood experiences with those of the effects of a female experiencing the effects of the Battered Woman's Syndrome. Dr. Hutchinson testified the Petitioner suffered from PTSD. Dr. Hutchinson also testified the Petitioner suffered from recklessness, risk taking behavior, anger, and low impulse control. She testified Petitioner learned as a child to fight back hard and strong to reduce subsequent victimization.

"Her finding was that the Petitioner's mind 'ordered him to some behavioral action and that he was, what was without conscious thought or decision.' She then attempted to indicate that meant Petitioner would have an objective standard of the need for self-defense.

"As the State indicated in its brief, Defense counsel are not required to obtain a psychological evaluation of every client to rule out a mental disease or defect defense. Sarah McKinnon had no basis to hold such a belief. Under the first *Strickland* standard, the performance of counsel was not deficient. Under the second prong, even if an error was made, it did not prevent the Petitioner from receiving a fair trial.

"An argument could be made the testimony of Dr. Hutchinson hurts the Petitioner's cause more than it aids his cause. The testimony can clearly be interpreted to indicate because of Defendant's childhood he was prone to strike out violently if he perceived a threat, was quick to anger, and had low impulse control."

The district court's factual findings are supported by substantial competent evidence. And in addition to the court's findings, we note that the transcript from the hearing includes the testimony of McKinnon on this issue. According to McKinnon, neither Alvarez nor his mother ever mentioned any sort of mental health issue to McKinnon before trial. And there is no indication that Alvarez or any other person ever spoke to McKinnon about Alvarez' history of abuse, substance abuse, and violent trauma. Although McKinnon admitted she never initiated a discussion about these things, Alvarez failed to provide any evidence or call a legal expert to establish that McKinnon's

16

performance was objectively unreasonable for this shortcoming. Even more significantly, Alvarez never testified about how his mental health issues affected his state of mind on November 23, 2011.

We conclude the district court's findings are support by sufficient evidence to support the court's legal conclusion that McKinnon was not deficient for failing to investigate and present a mental disease or defect defense.

### 3. *Failure to investigate and present evidence of Frank's violent character*

Alvarez next asserts that McKinnon was ineffective because she failed to elicit additional testimony and present evidence establishing Frank's violent character, which he alleges would have supported his claim of self-defense. Alvarez acknowledges that McKinnon did elicit testimony and evidence to establish Frank's violent character but suggests McKinnon did not do enough at trial to establish the height and weight disparity between Alvarez and Frank or to establish that Frank was a trained boxer. Alvarez also argues that McKinnon failed to elicit certain favorable testimony at trial from Magee, Liptow, and Alvarez allegedly establishing Frank's violent character. He finally argues that McKinnon failed to interview and call a witness named Jordan Schmucker, who would have testified that Frank was an aggressive person and that Frank had followed Alvarez into his home the night of the murder.

The district court found Alvarez failed to establish that McKinnon was ineffective as to this claim. Specifically, it explained that much of McKinnon's defense strategy centered on Frank's violent nature, and during trial she actively presented evidence of that nature. The court determined that McKinnon sufficiently pursued and presented myriad evidence of Frank's violent nature.

As Alvarez correctly notes in his brief, the Kansas Supreme Court has held that when self-defense is an issue in a homicide case, evidence of the deceased's turbulent character is admissible. This evidence may consist of the deceased's general reputation in the community or his or her criminal history. *State v. Davidson*, 264 Kan. 44, 56, 954 P.2d 702 (1998). Furthermore, in *State v. Walters*, 284 Kan. 1, 10-12, 159 P.3d 174 (2007), the Kansas Supreme Court later held that specific instances of a deceased's conduct, other than criminal convictions, could be admissible to determine the accused's state of mind at the time of a homicide.

The first step in the analysis is to determine whether McKinnon was deficient. The trial record shows that every chance McKinnon got, she brought up Frank's nickname "Ali" (named after the boxer Muhammed Ali), she brought up the fact Frank was a Golden Gloves boxer, and she brought up the height and weight disparity between Alvarez and Frank. McKinnon did this in her opening, in virtually every cross-examination she could, in the defense's case-in-chief, and in her closing.

The record also shows that at one point during trial, McKinnon tried entering evidence of Frank's criminal history in Kansas to contradict the State's rebuttal evidence. However, the district court did not allow it to come in because it would have been prejudicial. The specific record is a Kansas Adult Supervised Population Electronic Repository (KASPER) report showing Frank's felony and imprisonment record in Kansas. The KASPER report shows that Frank was previously imprisoned in Kansas on nonviolent felonies in 2008 and 2009.

Alvarez first takes issue with McKinnon's alleged failure to introduce at trial Magee's statements to police. He argues that Magee's statements—i.e., that Frank was angry the night of the murder, that Alvarez was likely acting in self-defense because of Frank's violent background, and that Frank had a violent criminal background—would have been helpful at trial to show Frank's violent character. Yet at trial, McKinnon

18

elicited testimony from Magee that Frank's nickname was Ali and that he was a Golden Gloves boxer and had been for some time. She testified that Frank was good at boxing. Magee also testified that Frank was "very angry" the night of the murder. At the very least, the record shows that McKinnon utilized Magee to introduce evidence of Frank's violent character and to support the self-defense theory.

Magee's interview with police was introduced at the evidentiary hearing and provided in the record. While it is true Magee told police that Frank had a criminal history score of A and that he had previously committed aggravated battery and aggravated assault, she did qualify that statement to police by saying she did not know for sure and that they would have to look up Frank's criminal background to confirm what she told them. McKinnon also testified at the evidentiary hearing that she and her investigator looked into Frank's criminal background, and it did not reflect what Magee told police.

In fact, Alvarez' own evidence establishes that Magee's understanding of Frank's alleged criminal background was incorrect. At the evidentiary hearing, habeas counsel introduced Frank's KASPER report—the same report McKinnon attempted to introduce at trial. As noted above, the report shows Frank's nonviolent felony record in Kansas, which indeed undermines Magee's statements to police that Frank was a violent felon.

Even Magee's statement to police that Alvarez was likely acting in self-defense because of Frank's violent background is speculative. Had McKinnon elicited such testimony at trial, it likely was objectionable. Alvarez' argument that Magee's statements would have been valuable to his defense at trial is unsupported by the evidence in the record.

While there is nothing in the record establishing what exactly Liptow told police— e.g., no police reports or narratives, no recording of his interview with police, etc.—

Alvarez claims that Liptow's statement to police would have been helpful in establishing Frank's violent character. Alvarez argues that during the interview, Liptow repeatedly referred to Frank as Ali and as a "knock out champ." Yet at trial, McKinnon elicited testimony from Liptow that Frank's nickname was Ali. Liptow testified that Frank told him Frank was a boxer and that Frank was proud of boxing and getting into fights. Liptow also testified that Frank talked to him a lot about his boxing and fighting background. The information Alvarez asserts Liptow provided to police is almost identical to the information McKinnon was able to elicit from Liptow at trial:  Frank's nickname was Ali, Frank was a trained boxer, and Frank liked to get into fights. Indeed, McKinnon did present evidence of Frank's violent reputation through Liptow at trial, and any additional statements from Liptow's interview with police would appear to have been cumulative. Alvarez' argument as to this point is meritless.

Alvarez also asserts that McKinnon was deficient for failing to discuss with or elicit testimony from Alvarez about specific instances of Frank's violent conduct, including a time where Frank boasted he had put someone in the hospital. The record shows that McKinnon elicited testimony at trial from Alvarez that Frank was a Golden Gloves boxer and that Frank was always known for getting into fights and winning. He also testified that Frank had a reputation for being a "big bad dude." Alvarez had an opportunity to discuss specific instances of Frank's alleged violent conduct with McKinnon before trial. The record is unclear as to whether any such discussions occurred, and McKinnon testified at the evidentiary hearing that she was unsure if Alvarez ever mentioned such instances to her. Alvarez also had an opportunity to testify at trial about specific instances of Frank's alleged violent conduct but failed to do so. There is nothing in the record to indicate—and Alvarez does not argue—that McKinnon ever prevented him from doing so. Without more information in the record, Alvarez' argument as to this point is unpersuasive.

20

Alvarez also takes issue with the fact that McKinnon did not interview or call Schmucker, Alvarez' former roommate, to testify about Frank's reputation for being an "aggressive person." However, as McKinnon testified at the evidentiary hearing, she had difficulty locating Schmucker to interview him before trial. Alvarez erroneously asserts that Schmucker was served with a subpoena before trial and McKinnon could have called him to testify. While it is true that the State issued a subpoena for Schmucker, the subpoena shows that Schmucker was never served with it. In fact, the subpoena notes that Schmucker was in jail in a different county at that time. McKinnon also testified that she chose not to have Schmucker testify given his extensive criminal history. Alvarez claims that McKinnon did not research Schmucker's criminal history because there was no record of it in her court file. However, had habeas counsel conducted a simple KASPER search, he could have corroborated McKinnon's testimony regarding Schmucker's extensive criminal history. Alvarez' argument as to this point fails.

Given the above analysis, it is clear that McKinnon could not have elicited that much more testimony or presented that much more evidence about Frank's alleged violent character. The evidence Alvarez states McKinnon could have elicited from Magee was uncorroborated, cumulative, or speculative. The evidence Alvarez states McKinnon could have elicited from Liptow was cumulative. The evidence Alvarez states McKinnon could have elicited from Alvarez may have been helpful at trial, but there is not enough evidence in the record to support a finding that McKinnon was deficient for failing to do so or that she prevented Alvarez from doing so. The evidence Alvarez states McKinnon could have elicited from Schmucker was tainted by the fact McKinnon could not locate him and by Schmucker's credibility issues.

The record clearly shows that McKinnon tried damaging Frank's character every chance she got throughout trial. As such, we cannot say that her performance fell below an objective standard of reasonableness. Consequently, Alvarez fails to establish that McKinnon's performance was deficient in this regard.

21

### 4. *Failure to suppress or redact Alvarez' statement to police*

Alvarez next argues that McKinnon was ineffective for failing to suppress or redact his statement to police. First, he asserts McKinnon should have suppressed his statement because it was not voluntarily made. He specifically claims that his mental condition was impaired due to his intoxication that night, he showed signs of fatigue throughout the interrogation, and he requested and was denied contact with his attorney in Tulsa and his friends. He also asserts that his statement was obtained in violation of *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), because officers continued to question him after he specifically invoked his right to counsel. Alternatively, Alvarez argues that his statement should have been redacted so that McKinnon could have presented only the favorable portions of his statement to the jury, including his reaction to learning about Frank's death. Alvarez argues that although McKinnon testified at the habeas hearing that this was her trial strategy, the trial transcript reflects she failed to follow through with this strategy.

The district court found that McKinnon employed a reasonable trial strategy when she decided against filing a motion to suppress Alvarez' statement to the police. This is because she believed there was little chance of success in pursuing suppression and because she felt Alvarez made statements during his interview that helped his defense more than it harmed his defense.

As previously noted, a trial counsel's decision to elect a particular defense theory or to call or not call certain witnesses is usually considered valid trial strategy. *Wilkins*, 286 Kan. at 982; see *Hedges*, 269 Kan. at 916. But defense counsel cannot make a strategic decision against pursuing a line of investigation when he or she has not yet obtained facts upon which that decision could be made. Further, when counsel lacks the information to make an informed decision due to inadequacies of his or her investigation, any argument of trial strategy is inappropriate. *Mullins*, 30 Kan. App. 2d at 716-17.

22

Alvarez has the burden of showing that McKinnon's decisions not to challenge his statement to police or introduce a redacted version of it to the jury were not valid strategic decisions—in other words, that McKinnon was deficient and that this deficiency prejudiced him. See *Strickland*, 466 U.S. at 687.

In this case, substantial competent evidence supports the district court's finding that McKinnon's reason for not filing a motion to suppress Alvarez' statement was a matter of trial strategy. At the evidentiary hearing, McKinnon testified that she reviewed Alvarez' recorded interview with the police. At the time she viewed it, she did not have any concerns that Alvarez involuntarily gave his statement to police. Furthermore, she believed he made some statements during his interrogation that would be helpful to his defense at trial. McKinnon believed she discussed this approach with Alvarez but could not recall. Neither the State nor McKinnon introduced the actual interview Alvarez' statement at trial. McKinnon testified that she thought she could highlight the helpful things from the interview during cross-examination of various witnesses. She did not think it would have been helpful to show the jury the interview because there were certain things that would have been damaging to his defense.

The record shows that at trial both the State and McKinnon elicited some of Alvarez' favorable statements. The State called Detective Tyson Meyers, one of the individuals who interviewed Alvarez. Meyers testified that Alvarez reported he did not remember getting into a fight or stabbing anyone the night before and that he suffered from blackouts when he drank alcohol—statements that supported Alvarez' voluntary intoxication theory. Meyers also testified that when he told Alvarez that Frank was dead, Alvarez got upset and he repeatedly said "no" over and over again. On cross-examination, McKinnon elicited testimony from Meyers highlighting the fact that Alvarez said he could not remember certain events from the night of the murder. She also highlighted Alvarez' reaction to news of Frank's death. She specifically asked Meyers about Alvarez rocking back and forth saying "no man" repeatedly. McKinnon brought this specific

23

reaction up in her opening statement and asked the jury to focus on it in her closing argument.

But Alvarez asserts that McKinnon failed to use a majority of the good statements that were elicited during his interview. Specifically, he claims that she should have brought up Alvarez' question asking why he would have gotten into a fight "especially with Ali." He also alleges that other statements he made—like the fact that he previously had blackouts when drinking, that he asked if Frank was okay, or that he asked why he would have stabbed Frank—should have been brought up at trial if it indeed was McKinnon's strategy to use Alvarez' police interview. But as noted above, both the State and McKinnon elicited testimony about many of these things, such as his issue with blackouts, his inability to recall fighting with or stabbing anyone the night of the murder, and his significant reaction to news of Frank's death. McKinnon's evidentiary hearing testimony shows that while she had no concerns about the voluntariness of Alvarez' statement to police and there were favorable statements that supported Alvarez' defense theories, she was hesitant to show it to the jury because there were damaging aspects of the interview. That fact combined with the fact that she and the State indeed highlighted Alvarez' favorable statements at trial shows that McKinnon gave the matter due consideration. Substantial competent evidence supports the district court's finding that McKinnon's decision not to seek suppression of Alvarez' statement to police was a valid strategic decision; as such, Alvarez fails to establish that counsel's performance was deficient in this regard.

5. *Failure to consult with and hire a toxicology expert*

Alvarez argues that McKinnon was ineffective for failing to consult with and hire a toxicology expert to support his voluntary intoxication theory. He asserts that one of McKinnon's main strategies was to present this defense, yet despite this fact, she never considered consulting a toxicologist to bolster this theory. Alvarez generally claims that

had McKinnon hired a toxicologist, the expert would have testified to the effects his alcohol consumption had on his ability to form an intent to kill Frank that night.

The district court found that McKinnon was not ineffective as to this issue. Specifically, it determined that McKinnon presented a voluntary intoxication defense at trial and even requested an instruction. However, the court rejected the instruction because, based on Alvarez' trial testimony that he could recall the events leading up to and during the stabbing, the court did not believe such an instruction was warranted. It also determined that McKinnon made a valid strategic decision to focus more on the self-defense theory as it was the stronger theory and the voluntary intoxication defense theory would have undermined the self-defense theory.

As previously noted, a trial counsel's decision to elect a particular defense theory or to call or not call certain witnesses is usually considered valid trial strategy. *Wilkins*, 286 Kan. at 982; see *Hedges*, 269 Kan. at 916. But defense counsel cannot make a strategic decision against pursuing a line of investigation when he or she has not yet obtained facts upon which that decision could be made. Further, when counsel lacks the information to make an informed decision due to inadequacies of his or her investigation, any argument of trial strategy is inappropriate. *Mullins*, 30 Kan. App. 2d at 716-17. Alvarez has the burden of showing that McKinnon's decision not to consult a toxicologist was not a valid strategic decision—in other words, that McKinnon was deficient and that this deficiency prejudiced him. See *Strickland*, 466 U.S. at 687.

This court must first determine if McKinnon's failure to consult and hire a toxicology expert constituted deficient performance. As explained below, Alvarez fails to establish how McKinnon is deficient here. At the evidentiary hearing, Alvarez failed to present any expert testimony from a toxicologist as to the specific effects Alvarez' alleged intoxication had on his ability to form an intent to murder on November 23, 2011. Without such testimony, Alvarez fails to establish how McKinnon was deficient. See,

25

e.g., *Bernhardt v. State*, No. 121,018, 2020 WL 3116719, at *5 (Kan. App. 2020) (unpublished opinion) (finding that habeas movant failed to establish deficient performance by his trial counsel for not consulting a toxicologist because movant never presented expert testimony from a toxicologist at the evidentiary hearing), *rev. denied* 312 Kan. __ (September 29, 2020).

Rather, Alvarez relies heavily on Dr. Hutchinson's testimony from the evidentiary hearing to establish McKinnon's alleged deficiency. But Dr. Hutchinson is a licensed psychologist and not an expert in toxicology. In his brief and his original memorandum supporting his K.S.A. 60-1507 motion, Alvarez summarized portions of Dr. Hutchinson's testimony. He points specifically to Dr. Hutchinson's testimony regarding how young adults like Alvarez lacked an appreciation for the "incredible dangerousness" implicit in consuming alcoholic beverages like Tilt. He also argues that Dr. Hutchinson testified that the amount of Tilt Alvarez drank on the night of the murder, in combination with his PTSD, would have rendered him unable to form the specific intent to kill.

Yet a review of the evidentiary hearing transcript reveals that Alvarez misconstrues Dr. Hutchinson's testimony. Although she generally testified about her research on the specific effects alcoholic drinks like Tilt have on young adults, she never connected these effects to Alvarez. She provided statistics on the amount of alcohol and caffeine contained in drinks like Tilt. While she noted that Alvarez may have drunk five or six Tilts the night of the murder, Dr. Hutchinson never explicitly testified about how that would have affected Alvarez' ability or inability to form the requisite intent to murder Frank. She also never testified that Alvarez' consumption of Tilt in combination with his mental health issues rendered Alvarez incapable of conscious thought or decision. Rather, she limited her testimony by stating that it was Alvarez' PTSD and his other mental health conditions that compromised his ability to form such an intent that night.

26

Dr. Hutchinson's testimony in no way connects Alvarez' alleged intoxication on November 23, 2011, with his inability to form an intent to commit murder. It certainly does not show how McKinnon's decision not to consult a toxicologist constitutes deficient performance. Simply put, Alvarez failed to present any evidence or testimony, expert or otherwise, that McKinnon's strategic decision not to consult a toxicologist was deficient. Because Alvarez failed to meet his burden and because substantial competent evidence supports the district court's finding, we affirm the district court ruling on this issue.

6. *Failure to interview and call key witnesses*

Finally, Alvarez claims that McKinnon was ineffective for failing to interview and call certain witnesses—namely Roberts and Ricky and Mary Conrad—whose testimony he asserts would have supported his self-defense and voluntary intoxication theories at trial. He also argues that one of these witnesses now provides significant support for his *Brady* violation claim.

As previously noted, a trial counsel's decision to elect a particular defense theory or to call or not call certain witnesses is usually considered valid trial strategy. *Wilkins*, 286 Kan. at 982; see *Hedges*, 269 Kan. at 916. But defense counsel cannot make a strategic decision against pursuing a line of investigation when he or she has not yet obtained facts upon which that decision could be made. Further, when counsel lacks the information to make an informed decision due to inadequacies of his or her investigation, any argument of trial strategy is inappropriate. *Mullins*, 30 Kan. App. 2d at 716-17. Alvarez has the burden of showing that McKinnon's decision not to interview these witnesses was not a valid strategic decision—in other words, that McKinnon was deficient and that this deficiency prejudiced him. See *Strickland*, 466 U.S. at 687.

27

Alvarez first argues that McKinnon was deficient for failing to interview and call Roberts to testify. He specifically argues that Roberts would have provided additional evidence of Frank's violent character, additional support for Alvarez' self-defense and voluntary intoxication theories, and additional support for Alvarez' new evidence claim discussed further below. At the evidentiary hearing, Roberts testified that Frank's nickname was Ali, Frank was a Golden Gloves boxer who fought a lot of people and knocked a lot of people out, and she heard from Magee that Frank once hospitalized someone. She also testified that on the night of the murder, she observed that Alvarez was belligerent and "drunk and wasted," although she could not confirm exactly how many alcoholic drinks he had that evening. Roberts confirmed that during the car ride home, Alvarez became angry and struck her and Magee several times. She stated that she heard Magee ask Frank if he was going to let Alvarez hit Magee like that, to which Frank responded, "[O]h, hell no." She explained that Frank jumped out of the car and took off running after Alvarez. Roberts explained she could hear Frank and Alvarez yelling at each other but could not make out what they were saying—just that Alvarez yelled at Frank to stop at one point. However, she admitted that she had epilepsy, and when Alvarez repeatedly hit her that night, she suffered an epileptic episode and had to be taken to the hospital. As a result, Roberts testified that she did not remember much of that night after Alvarez attacked her. Roberts finally testified that before trial, she overheard Montiel telling someone that Alvarez was going to trial and that Montiel would be "legal" following the trial. Alvarez suggests that Roberts' testimony regarding Montiel's statements strongly supports his new evidence claim.

The district court found that McKinnon was not ineffective for failing to interview and call Roberts to testify. This is because McKinnon had valid reasons for not wanting to call her. Specifically, it noted her testimony would have been damaging to Alvarez because she would have testified about the violent acts Alvarez perpetrated against her before stabbing Frank. The court found McKinnon's decision not to call Roberts a

28

reasonable trial strategy. It further explained that her testimony would have been cumulative.

We find substantial competent evidence supports the district court's conclusion that Roberts' testimony would have been cumulative, was likely unreliable, and would likely have damaged Alvarez' defense at trial. Evidence that Frank's nickname was Ali, Frank was a trained boxer, Frank fought a lot of people, and Alvarez was drunk and belligerent was presented at trial through multiple witnesses, including Montiel, Magee, Liptow, and Alvarez. Any additional testimony as to these points would have been cumulative. Evidence that Magee told her that Frank once hospitalized someone is evidence that Alvarez knew of and could have testified to at trial. As explained previously, there is not enough information in the record to determine why he did not. Roberts' testimony about the events following Alvarez' attack on her is likely unreliable given her admission that her epileptic episode prevented her from remembering much of anything after Alvarez hit her in the car. The district court even noted this point in its order denying Alvarez' motion. As the district court also correctly stated, Roberts' testimony is not necessarily helpful to Alvarez' cause. Not only would the jury have heard additional testimony about Alvarez beating Roberts, but they would have heard from Roberts the severe effects of those injuries. The fact that she could not remember what exactly happened after Alvarez struck her is further proof she would not have been able to shed more light on what occurred between Frank and Alvarez after they got out of the car but before they went inside Montiel and Alvarez' residence.

Further undermining Alvarez' claim is the fact that McKinnon's investigator had a difficult time locating and contacting Roberts before the trial. However, the record shows that she did meet with Roberts during trial and indicated she would call Roberts if she was needed. McKinnon also testified at the evidentiary hearing that she was hesitant to call Roberts because of the fact Alvarez punched and choked her. This testimony shows that McKinnon fully considered whether to call Roberts as a witness, but ultimately, she

29

decided not to for fear of eliciting more damaging testimony about Alvarez. This was a clear strategic decision on McKinnon's part.

Finally, while it is true that Roberts testified about overhearing a conversation before trial where Montiel indicated he would become a legal resident after the trial, as explained below in the *Brady* violation section, this information is not exculpatory or material. As such, Roberts' testimony about this conversation would not have been helpful to Alvarez. Accordingly, Alvarez fails to establish that McKinnon was deficient for failing to call Roberts as a witness because her decision not to was a valid strategic one.

Alvarez next argues that McKinnon was deficient for failing to interview and call the Conrads to testify. According to their police narratives, the Conrads were present at the bar the night of the murder. Ricky Conrad told police that he observed Alvarez acting crazy, like Alvarez was on some sort of narcotic. Mary Conrad told police that she observed Alvarez acting very strange, as if he were on some sort of narcotic. Alvarez was jumping up and down, and she eventually told him he needed to leave the bar.

Alvarez did not call the Conrads to testify at the habeas evidentiary hearing, but he asserts that based on their statements to the police, they would have provided valuable testimony that would have supported Alvarez' voluntary intoxication defense. The district court found that McKinnon was not ineffective for failing to interview and call the Conrads to testify. The court found that any evidence they would have presented would have been cumulative. Substantial competent evidence supports the district court's finding in this regard. McKinnon was able to elicit testimony at trial from Liptow, Magee, Montiel, some of the officers on the case, and Alvarez himself that Alvarez was intoxicated on November 23, 2011, and that he had been kicked out of the bar. Therefore, the Conrads' testimony would have been cumulative at best. McKinnon's failure to

interview the Conrads does not constitute deficient performance, and Alvarez fails to establish as much.

B. *Ineffective assistance of counsel claims relating to Kaul*

Alvarez next argues that his appellate counsel was ineffective for failing to raise two issues in his direct appeal: (1) Kaul failed to address the district court's rejection of a voluntary intoxication instruction and (2) Kaul failed to address the lack of a defense of dwelling instruction.

The test for determining whether appellate counsel was ineffective differs slightly from the test for determining whether trial counsel was ineffective. To determine ineffective assistance of appellate counsel, the habeas movant must first show that counsel's performance, based upon the totality of the circumstances, was deficient in that it fell below an objective standard of reasonableness. *State v. Smith*, 278 Kan. 45, 51-52, 92 P.3d 1096 (2004). To determine whether appellate counsel's performance was objectively reasonable, the reviewing court must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed at the time of counsel's conduct. The appellate court employs a strong presumption that counsel's conduct was reasonable. *Miller v. State*, 298 Kan. 921, 931, 318 P.3d 155 (2014). Appellate counsel's failure to raise an issue on direct appeal is not per se ineffective assistance. Counsel should only raise issues on appeal which, in the exercise of reasonable professional judgment, have merit. 298 Kan. at 932. The movant must then establish that his or her appeal was prejudiced to the extent that there is a reasonable probability that, but for counsel's deficient performance, the appeal would have been successful. *Smith*, 278 Kan. at 52. A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Miller*, 298 Kan. at 934.

31

1. *Failure to appeal the court's refusal to give a voluntary intoxication instruction*

Alvarez first asserts that Kaul was ineffective for failing to address on direct appeal the district court's rejection of his proposed voluntary intoxication instruction. He argues that because Kaul admitted at the evidentiary hearing that he should have raised the issue, Kaul's performance was deficient. Alvarez summarily argues that he was entitled to the voluntary intoxication instruction and, but for Kaul's failure to raise the issue on appeal, there was a reasonable probability his appeal would have been successful.

The district court found that Kaul was deficient for failing to raise this issue because when Kaul testified at the habeas evidentiary hearing he provided "no good reason" for not doing so. Nevertheless, the court conclusively determined that Alvarez could not establish prejudice. Noting that he was the trial judge in the underlying criminal case at which the instruction was requested, the court stated its belief that it made the right call when it rejected the voluntary intoxication instruction at trial and Alvarez was not entitled to it.

The record supports the district court's finding that Kaul was deficient as to this issue. At the evidentiary hearing Kaul testified that he could not remember why he did not raise the issue, it would have been a "pretty big red flag" for him especially if voluntary intoxication was a defense, and he had no recollection as to whether he considered the issue. There was simply no professional judgment exercised in failing to raise this issue on direct appeal. See *Miller*, 298 Kan. at 932.

However, the analysis does not end there as Alvarez must still prove he was prejudiced. This turns on whether Alvarez was entitled to a voluntary intoxication instruction in the first place. The extent to which voluntary intoxication is a defense in Kansas is governed by K.S.A. 2019 Supp. 21-5205(b), which states:

"An act committed while in a state of voluntary intoxication is not less criminal by reason thereof, but when a particular intent or other state of mind is a necessary element to constitute a particular crime, the fact of intoxication may be taken into consideration in determining such intent or state of mind."

See also *State v. Dominguez*, 299 Kan. 567, 591-92, 328 P.3d 1094 (2014) (voluntary intoxication valid defense when crime requires specific intent). So to establish that he was entitled to a voluntary intoxication instruction in the first place, Alvarez had to establish that there was sufficient evidence presented at trial that he was intoxicated on the night of the murder, and that at the time of the stabbing his intoxication impeded his ability to form the requisite intent to kill Frank. See K.S.A. 2019 Supp. 21-5205(b).

The crime of second-degree intentional murder is a specific intent crime, and "voluntary intoxication may be used as a valid defense." See *Dominguez*, 299 Kan. at 591-92. A voluntary intoxication instruction in this case would have been legally appropriate. But our Kansas Supreme Court has held that "simple consumption of drugs or alcohol is not enough to support" voluntary intoxication—"[p]roof of impairment is also necessary." *State v. Davis*, 306 Kan. 400, 414, 394 P.3d 817 (2017).

"A defendant's ability to recall the circumstances surrounding the charged crime and provide a coherent narrative of his or her conduct undercuts a claim of intoxication sufficient to warrant a jury instruction. *State v. Hernandez*, 292 Kan. 598, 606-07, 257 P.3d 767 (2011) (defendant's ability to recall his or her actions demonstrates faculties intact). [Citation omitted.]" *Davis*, 306 Kan. at 414-15.

See also *State v. Kidd*, 293 Kan. 591, 595-96, 265 P.3d 1165 (2011) (evidence defendant consumed alcohol from a bottle, made "crazy" statements, and may have been "'buzzed'" insufficient to require voluntary intoxication instruction). Moreover, a reviewing court "'will not infer impairment based on evidence of consumption alone.'" *State v. Reed*, 302 Kan. 390, 400, 352 P.3d 1043 (2015) (quoting *State v. Hilt*, 299 Kan. 176, 193, 322 P.3d

367 [2014]). A loss of memory or inability to remember events before or during the offense may establish the inability to form intent, as can evidence the defendant is "'so impaired that he or she has lost the ability to reason, to plan, to recall, or to exercise motor skills as a result of voluntary intoxication.'" *Reed*, 302 Kan. at 400 (quoting *State v. Betancourt*, 299 Kan. 131, 141-42, 322 P.3d 353 [2014]).

At trial, multiple witnesses testified that on the night of the murder, Alvarez consumed at least one or two Tilts—an alcoholic energy drink that contained up to 12% alcohol by volume—over the course of two hours. Some other witnesses testified he consumed more than one or two of these beverages. Several witnesses also testified that Alvarez was very drunk, belligerent, angry, and acting crazy. This behavior got him kicked out of a bar. These witnesses also testified that Alvarez behaved in a violent manner toward Roberts, repeatedly battering her in the car on the way home. Alvarez even testified at one point he blacked out, although he could not certainly say he did so because of the alcohol.

In his own testimony at trial, however, Alvarez was able to testify in detail about the events leading up to the stabbing and his reasoning for doing so. He specifically testified that he was scared of Frank because Frank was angry at him and he knew Frank was a trained boxer. He testified he kept telling Frank to leave him alone during the confrontation in the basement. Alvarez stated that Frank came toward him and he thought Frank was lunging at his neck, so he punched Frank and began to wrestle with Frank. When the two separated, Alvarez testified that he remembered feeling the knife in his pocket, he pulled it because he was scared of Frank, and he told Frank once again to leave him alone and that he would cut Frank if he had to. He said that Frank lunged at him again, and he held the knife out in front of him and stabbed Frank. Alvarez testified that he ran because he was afraid that Frank was going to come after him. This testimony tends to show that Alvarez had a clear recollection of the stabbing and a clear understanding of why he fought with Frank and drew the knife. Nowhere in his testimony

did he say that he was so drunk that it affected his ability to form an intent to murder Frank.

Based on Alvarez' detailed testimony at trial, we reject his argument that the district judge erred by refusing to give a voluntary intoxication instruction. Specifically, the instruction was not factually appropriate because of a lack of evidence of impairment that would prevent the formation of the necessary criminal intent. Having found no error by the district judge in refusing to give the argument, Alvarez is unable to establish that there was a reasonable probability that, but for appellate counsel's failure to challenge the district court's refusal to give the voluntary intoxication instruction, the appeal would have been successful.

### 2. *Failure to appeal lack of a defense of dwelling instruction*

We have concluded above that McKinnon was not deficient for failing to request a defense of dwelling instruction because Alvarez was not entitled to one. Because McKinnon was not deficient, Kaul necessarily cannot be deficient for failing to raise the issue for the same reasons.

### C. *New evidence and* Brady *violation claims*

Alvarez next claims that he learned of another witness who was present in his home the night of the stabbing:  a man named Christopher Villela. Alvarez asserts that this newly discovered evidence would have supported his self-defense claim and discredited the State's only eyewitness. He also argues that the State violated *Brady* when it failed to disclose information showing that Montiel was offered legal residency in exchange for testifying at Alvarez' trial.

1. *New evidence*

Alvarez asserts that Villela's testimony established strong support for Alvarez' self-defense theory. Specifically, he argues that Villela was in Montiel and Alvarez' home the night of the murder. Villela heard Frank threatening to beat up Alvarez and to "fuck him up." Villela said Montiel told him that Frank attacked Alvarez first and Alvarez cut Frank in the process. And finally, Alvarez claims that Villela's testimony established that Montiel and his girlfriend, Siomara Duran, lied about what happened that night. This is because both Montiel and Duran testified that the only people present in their house that night aside from them were their child and Montiel's nephew.

The district court found that Villela's testimony was not credible. It further determined that Villela's testimony was not relevant because he was not in the basement when the stabbing occurred. Even if Villela had testified at trial, the court explained there was no reasonable probability that the trial would have resulted in a different outcome.

As Alvarez received a full evidentiary hearing, this court should apply the newly discovered evidence standard as articulated in *State v. Rojas-Marceleno*, 295 Kan. 525, Syl. ¶ 12, 285 P.3d 361 (2012). To obtain a new trial on the basis of newly discovered evidence, a movant must establish (1) the exercise of reasonable diligence would not have produced the evidence at trial and (2) the evidence is so material that its production at trial would likely have yielded different results. 295 Kan. at 540.

Assuming without finding that Alvarez established the first component of the newly discovered evidence analysis, he fails to show how this evidence was material to his claim. Much of the evidence Villela offered at the evidentiary hearing was cumulative. For example, Villela testified that Frank—to whom he referred as "big white guy"—threatened to beat up Alvarez a few times. This evidence was already introduced at trial through Magee and Alvarez. Furthermore, the fact that Villela testified he was

36

present in Montiel and Alvarez' home that night does not conclusively prove Montiel and Duran were lying. First, no other witness who was present in the home that night testified that Villela was there. Montiel, Duran, Liptow, and Alvarez all testified about being inside the home that night, and none of them mentioned that anyone else except Montiel and his family were present. Second, according to Villela's testimony, when he told Alvarez he was at the house that night, Alvarez seemed surprised as if he did not know Villela had been there. Third, Montiel and Duran were consistent in their statements about the incident to several different police officers, and they testified at trial consistently with those statements. These facts severely undermine Villela's testimony that he was indeed present, so much so that the district court determined he was not a credible witness.

As a final point, even if Villela were present that night, he did not witness the stabbing. He could not have provided a different perspective of the incident. He did not bring up any new evidence that had not already been testified about at trial. It is difficult to conclude that any information Villela had was so material that it would have changed the outcome of Alvarez' trial. Because Alvarez fails to establish that Villela's testimony provided new material evidence, his claim necessarily fails. Accordingly, there is substantial competent evidence to support the district court's finding as to this issue, and this court affirms that ruling.

2. Brady *violation*

Alvarez also claims that the State withheld material information from him during trial: that it offered Montiel legal residence in exchange for his trial testimony. He asserts that during his direct appeal in 2014, the Reno County District Attorney completed an I-918 Supplement B, U Nonimmigrant Status Certification on Montiel's behalf. The certification, which was signed by District Attorney Keith Schroeder, showed that

Montiel testified as a cooperative witness for the State during a murder trial, and because of that Montiel should be given residency in the United States.

Based on the facts presented at the evidentiary hearing, the district court found that Montiel retained an immigration attorney's services to help him file for nonimmigrant status but did so *more than a year following trial*. As a part of the application, Montiel requested that he receive nonimmigrant status for being a cooperative witness in the murder trial approximately one year earlier. Montiel's attorney forwarded the application to Schroeder and asked him to fill it out and sign it. The court determined that none of this evidence conclusively established that the State made any kind of deal with Montiel in exchange for his testimony. Specifically, the court concluded that the State could not have known at the time of trial that Montiel would file an application some 16 months after trial. The evidence simply did not exist at the time of trial.

In *Brady*, the United States Supreme Court held that prosecutors have a positive duty to disclose evidence favorable to the accused when the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution. 373 U.S. at 87. In *State v. Warrior*, 294 Kan. 484, 277 P.3d 1111 (2012), the Kansas Supreme Court articulated three elements a movant must show in establishing a *Brady* violation:

> "There are three components or essential elements of a *Brady* violation claim: (1) "'The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching"'; (2) "'that evidence must have been suppressed by the State, either willfully or inadvertently"'; and (3) the evidence must be material so as to establish prejudice. [Citations omitted.]" *Warrior*, 294 Kan. at 506.

Alvarez' *Brady* claim proves fatal in the first step of the analysis. This is because nothing in the record indicates that there is evidence of any deal between the State and Montiel. Montiel sought and applied for nonimmigrant status more than a year following the trial. He hired an immigration attorney in Great Bend to assist with this application.

38

In his letter to Schroeder enclosing the application, Montiel's attorney stated that he was aware that Montiel had been a cooperative witness in a murder trial. He requested that Schroeder verify this fact and then fill out and sign the application. Nothing in the letter or the application suggests that Montiel made a deal with the State. And the fact that Montiel learned at some point after trial that he could file for legal residency because of his participation in Alvarez' trial does not automatically mean the State compelled Montiel to testify so he could obtain this status. That fact could be purely coincidental. If that is the case, then this evidence would not have been helpful to Alvarez at trial. While Alvarez speculates in his brief that this evidence would have been favorable to him at trial, he fails to conclusively establish the underlying fact. We find substantial competent evidence to support the district court's finding as to this claim.

D. *Cumulative error*

When a party argues that the cumulative impact of alleged errors is so great that they result in an unfair trial, this court aggregates all the errors and, even if those errors individually would be considered harmless, analyzes whether their cumulative effect is so great that they collectively cannot be determined to be harmless. *State v. King*, 297 Kan. 955, 986, 305 P.3d 641 (2013). In undertaking such an analysis, this court reviews the entire record and exercises unlimited review. *State v. Cruz*, 297 Kan. 1048, 1073-74, 307 P.3d 199 (2013).

In this case, we have determined appellate counsel was deficient for failing to challenge the district court's decision not to give an involuntary intoxication instruction. Nevertheless, we also have determined that Alvarez was not prejudiced based on counsel's deficiency in this regard because, even if raised, Alvarez failed to establish such a challenge would have been successful on appeal. Even if we were to construe appellate counsel's deficient performance as error, one error is insufficient to support reversal

under the cumulative error doctrine. *State v. Novotny*, 297 Kan. 1174, 1191, 307 P.3d 1278 (2013).

Affirmed.